ROSARIO ET AL. *v.* ROCKEFELLER, GOVERNOR OF
NEW YORK, ET AL.

No. 71–1371.   Argued December 13, 1972—Decided March 21, 1973

STEWART, J., delivered the opinion of the Court, in which BURGER,
C. J., and WHITE, BLACKMUN, and REHNQUIST, JJ., joined.   POW-
ELL, J., filed a dissenting opinion, in which DOUGLAS, BRENNAN, and
MARSHALL, JJ., joined, *post*, p. 763.

*Burt Neuborne* argued the cause for petitioners.   With
him on the brief were *Melvin L. Wulf* and *Seymour
Friedman*.

*A. Seth Greenwald,* Assistant Attorney General of New York, argued the cause for respondents Rockefeller et al. With him on the brief were *Louis J. Lefkowitz,* Attorney General, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *Irving Galt,* Assistant Attorney General. *Joseph Jaspan* filed a brief for respondents Meisser et al. *David N. Dinkins, pro se,* filed a brief for respondents Dinkins et al.

MR. JUSTICE STEWART delivered the opinion of the Court.

For more than 60 years, New York has had a closed system of primary elections, whereby only enrolled members of a political party may vote in that party's primary.[1]  Under the State's Election Law, a registered voter enrolls as a party member by depositing an enrollment blank in a locked enrollment box.  The last day for enrollment is 30 days before the general election each year.  Section 186 of the Election Law provides that the enrollment boxes shall not be opened until the Tuesday following the general election, and party affiliations are then entered on the State's official registration books.  The voter is then duly enrolled as a member of his party and may vote in a subsequent primary election.[2]

---

[1] See N. Y. Election Law § 131.  The State's first comprehensive primary law was enacted in 1911.

[2] Section 186 provides, in pertinent part:

"All enrollment blanks contained in the enrollment box shall remain in such box, and the box shall not be opened nor shall any of the blanks be removed therefrom until the Tuesday following the day of general election in that year.  Such box shall then be opened by the board of elections and the blanks contained therein shall be removed therefrom by the board, and the names of the party designated by each voter under such declaration, provided such party continues to be a party, as defined in this law shall be entered by the board, opposite the name of such voter in the

The effect of § 186 is to require a voter to enroll in the party of his choice at least 30 days before the general election in November in order to vote in the next subsequent party primary. If a voter fails to meet this deadline, he cannot participate in a party primary until after the following general election. Section 187 provides an exemption from this waiting period for certain classes of voters, including persons who have attained voting age after the last general election, persons too ill to enroll during the previous enrollment period, and persons who moved from one place to another within a single county. Under § 187, these classes of voters may be specially enrolled as members of a party even after the general election has taken place.[3]

---

appropriate column of the two copies of the register containing enrollment numbers for the election district in which such voter resides. . . . Such enrollment shall be complete before the succeeding first day of February in each year." This section finds its roots in the 1911 law. Laws 1911, c. 891, § 19.

[3] Section 187 provides, in pertinent part:

"Application for special enrollment, transfer or correction of enrollment. 1. At any time after January first and before the thirtieth day preceding the next fall primary, except during the thirty days preceding a spring primary, and except on the day of a primary, a voter may enroll with a party, transfer his enrollment after moving within a county, and under certain circumstances, correct his enrollment, as hereinafter in this section provided.

"2. A voter may enroll with a party if he did not enroll on the day of the annual enrollment (a) because he became of age after the preceding general election, or (b) because he was naturalized subsequent to ninety days prior to the preceding general election, or (c) because he did not have the necessary residential qualifications as provided by section one hundred fifty, to enable him to enroll in the preceding year, or (d) because of being or having been at all previous times for enrollment a member of the armed forces of the United States as defined in section three hundred three, or (e) because of being the spouse, child or parent of such member of the armed forces and being absent from his or her county of residence

The petitioners are New York residents who became eligible to vote when they came of age in 1971. Although they could have registered and enrolled in a political party before the cutoff date in 1971—October 2—they failed to do so.[4] Instead, they waited until early December 1971 to register and to deposit their enrollment blanks. At that time, they could not be specially and immediately enrolled in a party under § 187, since they had attained the voting age before, rather than after, the 1971 general election. Hence, pursuant to § 186, their party enrollment could not become effective until after the November 1972 general election. Because of New York's enrollment scheme, then, the petitioners were not eligible to vote in the presidential primary election held in June 1972.

---

at all previous times for enrollment by reason of accompanying or being with such member of the armed forces, or (f) because he was an inmate or patient of a veterans' bureau hospital located outside the state of New York at all previous times for enrollment, or the spouse, parent or child of such inmate or patient accompanying or being with such inmate or patient at such times, or (g) because he was incapacitated by illness during the previous enrollment period thereby preventing him from enrolling."

[4] The petitioners themselves admit this failure. The present consolidated case originated in two complaints, one by the petitioner Rosario and other named plaintiffs, on behalf of a class, and one by the petitioner Eisner. Paragraph 6 of Rosario's complaint stated that "[e]ach of these plaintiffs could have registered and enrolled on or before October 2nd, 1971, the last date of registration for the November 1971 elections. They each did not do so." Similarly, Eisner's complaint stated, in paragraph 5: "Plaintiff, Eisner, first became eligible to vote on December 30, 1970, upon the attainment of his twenty-first birthday." Whether the petitioners failed to enroll before the deadline because of inadvertence, because of lack of interest in the essentially local 1971 general election, or for other reasons is not clear, since none of them advances any explanation for this failure to enroll.

The petitioners filed these complaints for declaratory relief, pursuant to 42 U. S. C. § 1983, alleging that § 186 unconstitutionally deprived them of their right to vote in the June primary and abridged their freedom to associate with the political party of their choice. The District Court, in an unreported opinion, granted them the declaratory relief sought. The Court of Appeals for the Second Circuit reversed, holding § 186 constitutional. 458 F. 2d 649. We granted certiorari, but denied the petitioners' motion for summary reversal, expedited consideration, and a stay. 406 U. S. 957 (1972).[5]

The petitioners argue that, through § 186, New York disenfranchised them by refusing to permit them to vote in the June 1972 primary election on the ground that they had not enrolled in a political party at least 30 days prior to the preceding general election. More specifically, they contend that § 186 has operated to preclude newly registered voters, such as themselves, from participating in the primary election of the party of their choice. According to the petitioners, New York has no "compelling state interest" in its delayed-enrollment scheme so as to justify such disenfranchisement, and hence the scheme must fall. In support of this argument, the petitioners rely on several cases in which this Court has struck down, as violative of the Equal Protection Clause, state statutes that disenfranchised certain groups of people. *Carrington* v. *Rash,* 380 U. S. 89 (1965); *Kramer* v. *Union*

---

[5] Although the June primary election has been completed and the petitioners will be eligible to vote in the next scheduled New York primary, this case is not moot, since the question the petitioners raise is " 'capable of repetition, yet evading review.' " *Dunn* v. *Blumstein,* 405 U. S. 330, 333 n. 2 (1972); *Moore* v. *Ogilvie,* 394 U. S. 814, 816 (1969); *Southern Pacific Terminal Co.* v. *ICC,* 219 U. S. 498, 515 (1911).

*School District,* 395 U. S. 621 (1969); *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969); *Evans* v. *Cornman,* 398 U. S. 419 (1970); *City of Phoenix* v. *Kolodziejski,* 399 U. S. 204 (1970); *Dunn* v. *Blumstein,* 405 U. S. 330 (1972).

We cannot accept the petitioners' contention. None of the cases on which they rely is apposite to the situation here. In each of those cases, the State totally denied the electoral franchise to a particular class of residents, and there was no way in which the members of that class could have made themselves eligible to vote. In *Carrington,* for instance, the Texas Constitution disabled all servicemen from voting in Texas, no matter how long they had lived there. In *Kramer,* residents who were not property owners or parents were completely precluded from voting in school board elections. In *Cipriano* and *Kolodziejski,* the States prohibited non-property owners from ever voting in bond elections. In *Evans,* Maryland refused to permit residents at the National Institutes of Health, located within its borders, ever to vote in state elections. And in *Dunn,* Tennessee totally disenfranchised newly arrived residents, *i. e.,* those who had been residents of the State less than a year or residents of the county less than three months before the election.

Section 186 of New York's Election Law, however, is quite different. It did not absolutely disenfranchise the class to which the petitioners belong—newly registered voters who were eligible to enroll in a party before the previous general election. Rather, the statute merely imposed a time deadline on their enrollment, which they had to meet in order to participate in the next primary. Since the petitioners attained voting age before the October 2, 1971, deadline, they clearly could have registered and enrolled in the party of their choice before that date and been eligible to vote in the June 1972

primary.[6]   Indeed, if the petitioners had not been able
to enroll by the October 2, 1971, deadline because they
did not attain the requisite age until after the 1971 gen-
eral election, they would have been eligible for special
enrollment under § 187.   The petitioners do not say why
they did not enroll prior to the cutoff date; however, it is
clear that they could have done so, but chose not to.
Hence, if their plight can be characterized as disenfran-
chisement at all, it was not caused by § 186, but by their
own failure to take timely steps to effect their enrollment.[7]

For the same reason, we reject the petitioners' argu-
ment that § 186 violated their First and Fourteenth
Amendment right of free association with the political
party of their choice.   Since they could have enrolled
in a party in time to participate in the June 1972 pri-
mary, § 186 did not constitute a ban on their freedom
of association, but merely a time limitation on when they
had to act in order to participate in their chosen party's
next primary.[8]

---

[6] Not only would the petitioners have been eligible for the 1972
primary, but, since they were eligible in 1971 for special enrollment
under § 187, they could have, if they had timely registered and
enrolled, participated in the September 14, 1971, primary.

[7] The District Court held that the petitioners' failure to enroll
before the cutoff date was not truly voluntary, because it was not
done with sufficient awareness of the relevant circumstances and
likely consequences.   But this argument could well be made any
time a State imposes a time limitation or cutoff point for registra-
tion or enrollment.   The petitioners do not claim that they were
unaware of New York's deadline for enrollment.

[8] The dissent states that "[t]he Court apparently views this stat-
ute as a mere 'time deadline' on petitioners' enrollment . . . that
postpones through the next primary rather than denies altogether
petitioners' voting and associational rights." *Post,* at 766.   And
it argues that our decisions "have never required a permanent ban
on the exercise of voting and associational rights before a consti-
tutional breach is incurred." *Post,* at 766–767.   But the dissent mis-
characterizes our view of § 186.   We do not uphold the statute on

Indeed, under the New York law, a person may, if he wishes, vote in a different party primary each year. All he need do is to enroll in a new political party between the prior primary and the October cutoff date. For example, one June he could be a registered Republican and vote in the Republican primary. Before enrollment closed the following October, he could enroll in the Democratic Party. Since that enrollment would be effective after the November general election and before the following February 1, he could then vote in the next Democratic primary. Before the following October, he could register to vote as a Liberal, and so on. Thus, New York's scheme does not "lock" a voter into an unwanted pre-existing party affiliation from one primary to the next.[9]

---

the ground that it is merely a prohibition on voting in one particular primary, rather than a permanent ban on voting. That is neither our point nor the effect of the law. The point is that the statute did not prohibit the petitioners from voting in *any* election, including the 1972 primary, had they chosen to meet the deadline established by the law.

[9] The petitioners also argue that § 186 establishes a durational residence requirement unconstitutional under *Dunn* v. *Blumstein,* 405 U. S. 330 (1972), and violates the right to travel under *Shapiro* v. *Thompson,* 394 U. S. 618 (1969). Since the exemption in § 187 applies only to persons whose new residence is within the same county as their old residence, persons who arrive in New York State or move from one county to another after the cutoff date, and deposit their enrollment blank at that time, are barred by the delayed-enrollment scheme from voting in the next primary election. According to the petitioners, this constitutes an unconstitutional durational residence requirement and is violative of the 1970 amendments to the Voting Rights Act of 1965, 84 Stat. 316, 42 U. S. C. § 1973aa–1.

The petitioners, however, lack standing to raise these contentions. They make no claim that they are recently arrived residents of the State or that they have moved from one county to another nor even that they have changed their residence at all within the period relevant here. The petitioners cannot represent a class to which they do not belong.

The only remaining question, then, is whether the time limitation imposed by § 186 is so severe as itself to constitute an unconstitutionally onerous burden on the petitioners' exercise of the franchise or on their freedom of political association. As the dissent acknowledges, the State is certainly justified in imposing some reasonable cutoff point for registration or party enrollment, which citizens must meet in order to participate in the next election. *Post,* at 765. Hence, our inquiry must be whether the particular deadline before us here is so justified.

The cutoff date for enrollment prescribed by § 186 occurs approximately eight months prior to a presidential primary (held in June) and 11 months prior to a non-presidential primary (held in September). The petitioners argue that this period is unreasonably long, and that it therefore unduly burdens the exercise of their constitutional rights. According to the petitioners, § 186 requires party enrollment before prospective voters have knowledge of the candidates or issues to be involved in the next primary elections. The requirement is especially onerous, the petitioners say, as applied to new voters, who have never before registered to vote or enrolled in a political party.

It is true that the period between the enrollment deadline and the next primary election is lengthy. But that period is not an arbitrary time limit unconnected to any important state goal. The purpose of New York's delayed-enrollment scheme, we are told, is to inhibit party "raiding," whereby voters in sympathy with one party designate themselves as voters of another party so as to influence or determine the results of the other party's primary. This purpose is accomplished, the Court of Appeals found, not only by requiring party enrollment several months in advance of the primary, on the theory that "long-range planning in politics is quite difficult,"

458 F. 2d, at 653, but also by requiring enrollment prior to a general election. The reason for the latter requirement was well stated by the court below:

"[T]he notion of raiding, its potential disruptive impact, and its advantages to one side are not likely to be as apparent to the majority of enrolled voters nor to receive as close attention from the professional politician just prior to a November general election when concerns are elsewhere as would be true during the 'primary season,' which, for the country as a whole, runs from early February until the end of June. Few persons have the effrontery or the foresight to enroll as say, 'Republicans' so that they can vote in a primary some seven months hence, when they full well intend to vote 'Democratic' in only a few weeks. And, it would be the rare politician who could successfully urge his constituents to vote for him or his party in the upcoming general election, while at the same time urging a cross-over enrollment for the purpose of upsetting the opposite party's primary. Yet the operation of section 186 requires such deliberate inconsistencies if large-scale raiding were to be effective in New York. Because of the statute, it is all but impossible for any group to engage in raiding." *Ibid.*

It is clear that preservation of the integrity of the electoral process is a legitimate and valid state goal. Cf. *Dunn* v. *Blumstein, supra,* at 345; *Bullock* v. *Carter,* 405 U. S. 134, 145 (1972). In the service of that goal, New York has adopted its delayed-enrollment scheme; and an integral part of that scheme is that, in order to participate in a primary election, a person must enroll *before* the preceding general election. As the Court of Appeals stated: "Allowing enrollment any time after

the general election would not have the same deterrent effect on raiding for it would not put the voter in the unseemly position of asking to be enrolled in one party while at the same time intending to vote immediately for another." 458 F. 2d, at 653. For this reason, New York's scheme requires an insulating general election between enrollment and the next party primary. The resulting time limitation for enrollment is thus tied to a particularized legitimate purpose, and is in no sense invidious or arbitrary. Cf. *Lippitt* v. *Cipollone,* 404 U. S. 1032 (1972).[10]

New York did not prohibit the petitioners from voting in the 1972 primary election or from associating with the political party of their choice. It merely imposed a legitimate time limitation on their enrollment, which they chose to disregard.

Accordingly, the judgment below is

*Affirmed.*

---

[10] The petitioners contend that New York already has less drastic means to prevent raiding—means that would accomplish the State's goal yet would permit the registrant who inadvertently failed to enroll in time to vote in the primary. Specifically, the petitioners point to § 332 of the State's Election Law, which provides that the party enrollment of any voter may be challenged by any party member and, upon the determination by the chairman of the party's county committee that the voter is not in sympathy with the principles of the party, may be canceled by a justice of the State Supreme Court after a hearing. That section, however, is clearly too cumbersome to have any real deterrent effect on raiding in a primary. Every challenge to a would-be raider requires a full administrative and judicial inquiry; proof that the challenged voter is not in sympathy with the party's principles demands inquiry into the voter's mind; and even if the challenge is successful, it strikes from the enrollment books only one name at a time. In the face of large-scale raiding, § 332 alone would be virtually ineffectual. We agree with the Court of Appeals that "[i]n requiring that the state use to a proper end the means designed to impinge minimally upon fundamental rights, the Constitution does not require that the state choose ineffectual means." 458 F. 2d, at 654.

MR. JUSTICE POWELL, with whom MR. JUSTICE DOUG-
LAS, MR. JUSTICE BRENNAN, and MR. JUSTICE MARSHALL
join, dissenting.

I

It is important at the outset to place New York's cut-
off date for party enrollment in perspective. It prevents
prospective voters from registering for a party primary
some eight months before a presidential primary and 11
months before a nonpresidential one.[1] The Court rec-
ognizes, as it must, that the period between the enroll-
ment and the primary election is a "lengthy" one.[2] In-
deed, no other State has imposed upon voters previously
unaffiliated with any party restrictions which even ap-
proach in severity those of New York.[3] And New York

---

[1] October 2, 1971, was the last day on which petitioners' enrollment
could have been effective. June 20, 1972, was the date of New York's
presidential primary. Thus, the deadline was actually some eight
and one-half months before the primary. In nonpresidential years,
the cutoff runs from early October until the following September.

[2] *Ante,* at 760.

[3] The State does not dispute this point. See Tr. of Oral Arg. 34.

Massachusetts, Illinois, New Jersey, Texas, and Ohio permit pre-
viously unaffiliated voters to declare their initial party affiliation
immediately prior to voting in the primary of their choice. See
Mass. Gen. Laws Ann., c. 53, §§ 37, 38 (Supp. 1973); Ill. Rev. Stat.,
c. 46, §§ 5–30, 7–43, 7–45 (1971); N. J. Stat. Ann. § 19:23–45 (1964);
Tex. Election Code, Art. 13.01a (Supp. 1972–1973); Ohio Rev. Code
Ann. § 3513.19 (1960).

California and Pennsylvania permit previously unaffiliated voters
to declare an initial party preference up to the close of registration
immediately preceding the primary. Calif. Elections Code §§ 22,
203, 311–312 (1961) (registration closes in California 53 days before
a primary); Pa. Stat. Ann., Tit. 25, §§ 623–17, 951–16 (1963 and
Supp. 1972–1973) (registration closes in Pennsylvania 50 days before
a primary).

Michigan permits any registered voter to participate in the pri-
mary of his choice. Mich. Comp. Laws §§ 168.570, 168.575 to
168.576, Mich. Stat. Ann. §§ 6.1570, 6.1575–6.1576 (1972). See Brief
for Petitioners 32–33.

concedes that only one other State—Kentucky—has imposed as stringent a primary registration deadline on persons with prior party affiliations.[4]  Confronted with such a facially burdensome requirement, I find the Court's opinion unconvincing.

The right of all persons to vote, once the State has decided to make it available to some, becomes a basic one under the Constitution. *Dunn* v. *Blumstein,* 405 U. S. 330 (1972); *Kramer* v. *Union School District,* 395 U. S. 621 (1969); *Carrington* v. *Rash,* 380 U. S. 89 (1965).  Self-expression through the public ballot equally with one's peers is the essence of a democratic society. *Reynolds* v. *Sims,* 377 U. S. 533 (1964).  A citizen without a vote is to a large extent one without a voice in decisions which may profoundly affect him and his family. Whatever his disagreement may be with the judgments of public officials, the citizen should never be given just cause to think that he was denied an equal right to elect them.

Yet the Court today upholds a statute which imposes substantial and unnecessary restrictions on this right, as well as on the closely related right to associate with the party of one's choice.  See *Williams* v. *Rhodes,* 393 U. S. 23 (1968); *NAACP* v. *Alabama,* 357 U. S. 449 (1958); *United States* v. *Robel,* 389 U. S. 258 (1967). The Court justifies this holding by placing the responsibility upon petitioners for their failure to enroll, as required by New York law, eight months prior to the presidential primary.  We are told that petitioners "clearly could have registered and enrolled in the party of their choice" before the cutoff date and been eligible to vote in the primary, but for undetermined reasons "chose not to," and that their disfranchisement re-

---

[4] Tr. of Oral Arg. 34.

sulted from "their own failure to take timely steps to effect their enrollment." [5]

If the cutoff date were a less severe one, I could agree. Certainly, the State is justified in imposing a reasonable registration cutoff prior to any primary or general election, beyond which a citizen's failure to register may be presumed a negligent or wilful act forfeiting his right to vote in a particular election. But it is difficult to perceive any persuasive basis for a registration or party enrollment deadline eight to 11 months prior to election. Failure to comply with such an extreme deadline can hardly be used to justify denial of a fundamental constitutional right. Numerous prior decisions impose on us the obligation to protect the continuing availability of the franchise for all citizens, not to sanction its prolonged deferment or deprivation. *Ex parte Siebold,* 100 U. S. 371 (1880); *Nixon* v. *Herndon,* 273 U. S. 536 (1927); *Lane* v. *Wilson,* 307 U. S. 268 (1939); *Baker* v. *Carr,* 369 U. S. 186 (1962); *Gray* v. *Sanders,* 372 U. S. 368 (1963); *Wesberry* v. *Sanders,* 376 U. S. 1 (1964); *Reynolds* v. *Sims, supra; Carrington* v. *Rash, supra; Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663 (1966); *Kramer* v. *Union School District, supra; Cipriano* v. *City of Houma,* 395 U. S. 701 (1969); *Evans* v. *Cornman,* 398 U. S. 419 (1970); *City of Phoenix* v. *Kolodziejski,* 399 U. S. 204 (1970); *Bullock* v. *Carter,* 405 U. S. 134 (1972); *Dunn* v. *Blumstein, supra.*

The majority excuses the challenged statute because it does not "absolutely" disenfranchise petitioners or impose any absolute ban on their freedom of association.[6]

---

[5] *Ante,* at 757, 758. See also *ante,* at 762, where the Court refers to § 186 as merely imposing "a legitimate time limitation on their [petitioners'] enrollment, which they chose to disregard."

[6] See *ante,* at 757:

"Section 186 of New York's Election Law, however, is quite different. It did not absolutely disenfranchise the class to which the

The State likewise contends this is "not a disenfranchising statute." [7] The Court apparently views this statute as a mere "time deadline" on petitioners' enrollment that disadvantages no identifiable class and that postpones through the next primary rather than denies altogether petitioners' voting and associational rights. [8] I cannot agree. Deferment of a right, especially one as sensitive and essential as the exercise of the first duty of citizenship, can be tantamount to its denial. And any statute which imposes for eight or 11 months an absolute freeze on party enrollment and the consequent right to vote totally disfranchises a class of persons who, for quite legitimate reasons, decide to register closer than eight months to the primary date and those who, for equally legitimate reasons, wish to choose or alter party affiliation. Our decisions, moreover, have never required

---

petitioners belong—newly registered voters who were eligible to enroll in a party before the previous general election. Rather, the statute merely imposed a time deadline on their enrollment, which they had to meet in order to participate in the next primary."

Similarly at 758:

"For the same reason, we reject the petitioners' argument that § 186 violated their First and Fourteenth Amendment right of free association with the political party of their choice. Since they could have enrolled in a party in time to participate in the June 1972 primary, § 186 did not constitute a ban on their freedom of association, but merely a time limitation on when they had to act in order to participate in their chosen party's next primary."

And at 762:

"New York did not prohibit the petitioners from voting in the 1972 primary election or from associating with the political party of their choice. It merely imposed a legitimate time limitation on their enrollment, which they chose to disregard."

In all these instances, the majority seeks to distinguish a "time limitation" from an absolute disenfranchisement of petitioners or an absolute ban on their associational rights.

[7] Tr. of Oral Arg. 35.

[8] *Ante,* at 757 and n. 6, *supra.*

a permanent ban on the exercise of voting and associational rights before a constitutional breach is incurred. Rather, they have uniformly recognized that any serious burden or infringement on such "constitutionally protected activity" is sufficient to establish a constitutional violation, *Dunn* v. *Blumstein, supra,* at 343; *NAACP* v. *Button,* 371 U. S. 415, 438 (1963); *Reynolds* v. *Sims, supra,* at 561–562.

## II

The majority does not identify the standard of scrutiny it applies to the New York statute. We are told only that the cutoff date is "not an arbitrary time limit unconnected to any important state goal"; [9] that it is "tied to a particularized legitimate purpose, and is in no sense invidious or arbitrary." [10] The Court does not explain why this formulation was chosen, what precedents support it, or how and in what contexts it is to be applied. Such nebulous promulgations are bound to leave the lower courts and state legislatures in doubt and confusion as to how we will approach future significant burdens on the right to vote and to associate freely with the party of one's choice.

The Court's formulation, though the terminology is somewhat stronger, resembles the traditional equal protection "rational basis" test. One may agree that the challenged cutoff date is rationally related to the legitimate interest of New York in preventing party "raiding." But this Court's prior decisions simply do not permit such an approach. Rather, they recognize that:

> "[T]he right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil

---

[9] *Ante,* at 760.

[10] *Ante,* at 762.

and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds* v. *Sims, supra,* at 561–562.

See also *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886).

Voting in a party primary is as protected against state encroachment as voting in a general election. *Bullock* v. *Carter, supra; Terry* v. *Adams,* 345 U. S. 461 (1953); *United States* v. *Classic,* 313 U. S. 299 (1941). And the Court has said quite explicitly that "if a challenged statute grants the right to vote to some citizens and denies the franchise to others, 'the Court must determine whether the exclusions are *necessary* to promote a *compelling* state interest.'" *Dunn* v. *Blumstein, supra,* at 337, quoting *Kramer* v. *Union School District, supra,* at 627 (emphasis added in *Dunn*). See also *Cipriano* v. *City of Houma, supra,* at 704; *City of Phoenix* v. *Kolodziejski, supra,* at 205, 209. Likewise, the Court has asserted that "the right of individuals to associate for the advancement of political beliefs" is "among our most precious freedoms," *Williams* v. *Rhodes,* 393 U. S., at 30, and must be carefully protected from state encroachment. *NAACP* v. *Alabama, supra; Bates* v. *Little Rock,* 361 U. S. 516 (1960); *Gibson* v. *Florida Legislative Investigation Committee,* 372 U. S. 539 (1963).

The inquiry thus becomes whether the instant statute, burdening as it does fundamental constitutional rights, can withstand the strict judicial scrutiny called for by our prior cases. The asserted state interest in this case is the prevention of party "raiding," which consists of the movement or "crossover" by members of one party into another's primary to "defeat a candidate who is adverse to the interests they care to advance." [11] The typical example is a member of one party deliberately entering

---

[11] Tr. of Oral Arg. 29.

another's primary to help nominate a weaker candidate, so that his own party's nominee might win more easily in the general election. A State does have an interest in preventing such behavior, lest "the efficacy of the party system in the democratic process—its usefulness in providing a unity of divergent factions in an alliance for power—would be seriously impaired," *Rosario* v. *Rockefeller*, 458 F. 2d 649, 652 (CA2). The court below held flatly that the state interest in deterring "raiding" was a "compelling" one. *Ibid.*

The matter, however, is not so easily resolved. The importance or significance of any such interest cannot be determined in a vacuum but, rather, in the context of the means advanced by the State to protect it and the constitutionally sensitive activity it operates to impede. The state interest here is hardly substantial enough to sustain the presumption, upon which the statute appears to be based, that most persons who change or declare party affiliation nearer than eight to 11 months to a party primary do so with intent to raid that primary. Any such presumption assumes a willingness to manipulate the system which is not likely to be widespread.

Political parties in this country traditionally have been characterized by a fluidity and overlap of philosophy and membership. And citizens generally declare or alter party affiliation for reasons quite unconnected with any premeditated intention to disrupt or frustrate the plans of a party with which they are not in sympathy. Citizens customarily choose a party and vote in its primary simply because it presents candidates and issues more responsive to their immediate concerns and aspirations. Such candidates or issues often are not apparent eight to 11 months before a primary. That a citizen should be absolutely precluded so far in advance from voting in a party primary in response to a sympathetic candidate, a new or meaningful issue, or changing party philosophies in his State, runs contrary to the fundamental rights of

personal choice and expression which voting in this country was designed to serve.

Whatever state interest exists for preventing crossovers from one party to another is appreciably lessened where, as in the case of petitioners, there has been no previous affiliation with any political party. The danger of voters in sympathy with one party "raiding" another party is insubstantial where the voter has made no prior party commitment at all. Certainly, the danger falls short of the overriding state interest needed to justify denying petitioners, so far in advance, the right to declare an *initial* party affiliation and vote in the party primary of their choice.

## III

In *Dunn, supra,* at 343, the Court emphasized that the State, in pursuing its legitimate interest,

> "cannot choose means which unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with 'precision,' *NAACP* v. *Button,* 371 U. S. 415, 438 (1963); *United States* v. *Robel,* 389 U. S. 258, 265 (1967), and must be 'tailored' to serve their legitimate objectives. *Shapiro* v. *Thompson, supra,* at 631. And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.' *Shelton* v. *Tucker,* 364 U. S. 479, 488 (1960)."

The Court indicates that placing the enrollment deadline before the preceding general election serves well the state interest in discouraging party "raiding."[12] This fails to address the critical question of whether that interest may be protected adequately by less severe measures.

---

[12] *Ante,* at 761.

A foreshortening of the challenged period in this case would not leave the party structure of New York helpless and vulnerable to "raiding" activities. Other States, with varied and complex party systems, have maintained them successfully without the advanced enrollment deadline imposed by New York.

Partisan political activities do not constantly engage the attention of large numbers of Americans, especially as party labels and loyalties tend to be less persuasive than issues and the qualities of individual candidates. The crossover in registration from one party to another is most often impelled by motives quite unrelated to a desire to raid or distort a party's primary. To the extent that deliberate raiding occurs, it is usually the result of organized effort which depends for its success upon some relatively immediate concern or interest of the voters. This type of effort is more likely to occur as a primary date draws near. If New York were to adopt a more reasonable enrollment deadline, say 30 to 60 days, the period most vulnerable to raiding activity would be protected. More importantly, a less drastic enrollment deadline than the eight or 11 months now imposed by New York would make the franchise and opportunities for legitimate party participation available to those who constitutionally have the right to exercise them.[13]

---

[13] Petitioners also suggest other "less drastic" means of protecting the State's interest: greater reliance on the summary disenrollment procedures of § 332 of the State's election law and loyalty oaths, restrictive party affiliation rules optional for those parties who wish them, limitation of the statute's operation to persons with pre-existing party affiliations, and criminal sanctions for fraudulent participation in the electoral process. Tr. of Oral Arg. 13–21. I make no judgment either on the efficacy of these alternatives in protecting the State's interest or on their potential infringement of constitutionally protected rights. Their presence, however, points to the range and variety of other experimental techniques available for New York to consider.