Simon C. FIREMAN, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civil Action No. 97–12305–WGY.

United States District Court,
D. Massachusetts.

Sept. 15, 1998.

Morris M. Goldings, MA, Richard S. Jacobs, Mahoney, Hawkes & Goldings, Boston, MA, for plaintiff.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

Pursuant to 28 U.S.C. § 2255, Simon C. Fireman ("Fireman") seeks to have his sentence vacated, set aside, or corrected on the grounds that the sections of the Federal Election Campaign Act ("FECA") under which he was prosecuted violate his First Amendment rights of freedom of expression and association under the United States Constitution both on their face and as applied.[1] Fireman also argues that the Supreme Court's decision in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ought today be disregarded by this Court because that decision, upholding as constitutional the $1,000 limitation on direct or indirect contributions by individuals and groups to any single candidate or the candidate's authorized committee, with respect to any election

for federal office, "severely undermine[s] to a material degree the potential for robust and effective discussions of candidates and campaign issues by individual citizens, associations, the press, candidates, and political parties." Plt.'s Brief at 7.

## BACKGROUND

Petitioner Fireman filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 regarding a sentence entered by this Court on October 23, 1996, following a guilty plea. Fireman pled guilty to:

1. Conspiracy to interfere with the lawful functions of the Federal Election Commission and to knowingly and willfully make contributions in the name of third persons in violation of 18 U.S.C. § 371 (Count 1);

2. Making contributions in the name of an individual other than the true donor in violation of 2 U.S.C. §§ 441a(f) and 437g(d) (Counts 2–8);

3. Making contributions in excess of the $1,000 statutory limit on campaign contributions to any candidate in violation of 2 U.S.C. §§ 441a(a)(1) and 437g(d) (Counts 71–72)

4. Making contributions in excess of the $25,000 statutory limit on aggregate campaign contributions in violation of 2 U.S.C. §§ 441a(a)(3) and 437g(d) (Count 73).

He was then sentenced to probation for a term of one year, the first six months to be served in home confinement with specific restrictions, and to pay a fine of one million dollars ($1,000,000) along with a special assessment of $300.

On May 27, 1997, Fireman filed a Complaint for Declaratory Relief seeking a declaration that the filing of his proposed section 2255 motion would not breach his plea agreement and an injunction against the U.S. Attorney's office prohibiting it from bringing dismissed or further criminal charges against Fireman if he files the motion. The United States moved to dismiss the Complaint. On October 14, 1997, this Court denied as moot the motion to dismiss and instructed Fire-

---

1. His motion states, in pertinent part: "The Federal Election Campaign Act limiting contributions as enacted and as applied in this case violated Movant's rights of freedom of expression and association guaranteed by the First Amendment to the United States Constitution...."

man that he could file a section 2255 motion without consequence. Thereafter, on October 15, 1997, Fireman filed this section 2255 motion.

## DISCUSSION

### A. Standing

In its response to Fireman's motion, the United States argues that Fireman lacks standing to challenge the constitutionality of his conviction under section 315 of the Federal Election Campaign Act, the part of the Act that imposes contribution limits. That part of his conviction relates to counts 71–73 for which, the United States claims, Fireman only received a fine and has never been "in custody." *See Smullen v. United States*, 94 F.3d 20, 25–26 (1st Cir.1996) (holding that a petitioner who is rightfully imprisoned cannot challenge the imposition of a fine or restitution under section 2255). The United States' interpretation of the sentence imposed on Fireman following his plea of guilty is incorrect. A review of the judgment of conviction and the criminal docket sheet shows that this Court imposed the same penalty for each count to which Fireman pled guilty, the sentence on each count to run concurrently, one with the others. *See* Pet'r's Reply to Government's Further Mem., Attach. 1 & 2. Fireman's section 2255 motion challenges not only the fine but the entire sentence and the jurisdiction of this Court to impose the sentence based on the unconstitutionality of FECA. Fireman thus has standing to challenge his conviction and sentence pursuant to 28 U.S.C. § 2255.

### B. Procedural Default

■■■ In its response to Fireman's motion, the United States argues that Fireman's failure to raise his constitutional issue prior to the entry of his plea constitutes procedural default barring collateral attack. The Court disagrees. A valid guilty plea does not waive jurisdictional defects. *See, e.g., United States v. Broce*, 488 U.S. 563, 569, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989); *Valencia v. United States*, 923 F.2d 917, 921 (1st Cir. 1991). "[A] plea of guilty to a charge does not waive a claim that—judged on its face— the charge is one which the state may not constitutionally prosecute." *Menna v. New York*, 423 U.S. 61, 62 n. 2, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975) (per curiam). Fireman's claim that the statute under which he was charged is unconstitutional raises a jurisdictional question. If the statute is unconstitutional, then the information on its face failed to state a federal offense and this Court had no original subject matter jurisdiction. *See Ex Parte Siebold*, 100 U.S. 371, 376–77, 25 L.Ed. 717 (1880); *O'Leary v. United States*, 856 F.2d 1142, 1143 (8th Cir.1988). Fireman may raise this jurisdictional defect in a section 2255 motion, even when this claim was not raised on direct appeal. *See United States v. Harper*, 901 F.2d 471, 472 (5th Cir.1990); *United States v. Prince*, 868 F.2d 1379, 1383 (5th Cir.1989); *Robinson–Munoz v. United States*, 819 F.Supp. 1136, 1144 (D.P.R.1993). A guilty plea does not preclude raising a constitutional claim on collateral review challenging "the very power of the State to bring the defendant into court to answer the charge brought against him." *Blackledge v. Perry*, 417 U.S. 21, 30, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), *rev'd on other grounds, Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) (petitioner challenged his indictment after the entry of a guilty plea and without a direct appeal on the grounds that the indictment violated his due process rights).

The United States argues that even if Fireman can file a section 2255 motion, his ability to obtain relief under this motion is barred by his procedural default, pursuant to *United States v. Frady*, 456 U.S. 152, 167–68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (*Frady* teaches that to obtain collateral relief based on trial errors to which no contemporaneous objection was made as required by Fed. R.Crim.P. 30, a convicted defendant must show cause and actual prejudice). *See also Davis v. United States*, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973) (petitioner's failure to object to the composition of the grand jury prior to trial, as required by Fed. R.Crim.P. 12[b][2], constituted waiver from which relief could be granted only upon a showing of cause and actual prejudice). The Government's reliance on *Frady* is misplaced. "In each of these cases, the Supreme Court found a procedural default and

applied the cause and prejudice standard only after the defendant had violated a specific procedural rule by failing to raise his claim." *English v. United States,* 42 F.3d 473, 477 (9th Cir.1994). Here, there is no procedural rule that required Fireman to raise his jurisdictional claim prior to the plea under penalty of default. Federal Rule of Criminal Procedure 12(b)(2) does not apply to Fireman.[2] This rule "applies to both procedural and constitutional defects in the institution of prosecutions *which do not affect the jurisdiction of the trial court.*" *Davis,* 411 U.S. at 236–37, 93 S.Ct. 1577, 36 L.Ed.2d 216 (emphasis added). Prosecuting an information under an unconstitutional statute is a constitutional defect affecting the jurisdiction of the trial court.

In this case, Fireman is not challenging the sentence imposed or the authority of the district court to impose an enhanced sentence. Instead, he is challenging the constitutional validity of his conviction on the grounds that "the judgment of conviction is void for want of jurisdiction of the trial court to render it." *Waley v. Johnston,* 316 U.S. 101, 104–05, 62 S.Ct. 964, 86 L.Ed. 1302 (1942). "[The legislative] history makes clear that § 2255 was intended to afford federal prisoners a remedy identical in scope to federal habeas corpus." *Davis v. United States,* 417 U.S. 333, 343–44, 94 S.Ct. 2298, 41

L.Ed.2d 109 (1974); *accord United States v. Hayman,* 342 U.S. 205, 219, 72 S.Ct. 263, 96 L.Ed. 232 (1952) ("[T]he sole purpose [of section 2255] was to minimize the difficulties encountered in habeas corpus hearings by affording the *same rights* in another and more convenient forum.") (emphasis added). This is the traditional purpose of the writ of habeas corpus. *See Ex Parte Siebold,* 100 U.S. 371, 25 L.Ed. 717 (1880). Thus, the United States' reliance on *Knight v. United States,* 37 F.3d 769 (1st Cir.1994) and *Suveges v. United States,* 7 F.3d 6 (1st Cir.1993) is also misplaced.[3]

■ The United States is correct that procedural errors and, generally, constitutional claims must be objected to and raised on direct appeal. *Knight* establishes that "[n]ormally, failure to raise a constitutional issue on direct appeal will bar raising the issue on collateral attack unless the defendant can show cause for the failure and actual prejudice." *Knight,* 37 F.3d at 774 (citing *Coleman v. Thompson,* 501 U.S. 722, 750 [111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991) ] ). There are, however, several exceptions to the general principle that "the writ of habeas corpus will not be allowed to do service for an appeal." *Sunal v. Large,* 332 U.S. 174, 178, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947). These are: first, when the conviction was obtained under an allegedly unconstitutional

---

**2.** This rule states, in pertinent part, that:
  Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion.... The following must be raised prior to trial:

  (2) Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings); ...

**3.** In *Knight,* the First Circuit emphasizes that a section 2255 motion is not a substitute for direct appeal. In that case, the petitioner alleged error on the part of the district court in the application of the sentencing guidelines. This claim was never raised on direct appeal. Because the error, if any, did not constitute "a complete miscarriage of justice," the court held that the petitioner was barred because of procedural default.
  *Suveges* is cited by the United States for the proposition that the cause and prejudice stan-

dard of *Frady* applies to procedural default of a jurisdictional claim. In that case, the petitioner failed to object or directly to appeal the district court's imposition of an enhanced supervised release term. Later, on his section 2255 motion, the petitioner averred that the district court failed to provide the statutorily required informational notice and, therefore, could not impose the enhanced sentencing term. The court held that since the petitioner failed to raise the objection earlier, such failure was a procedural default. In support of this holding, the court cites to *Ford v. United States,* 983 F.2d 897, 898 (8th Cir.1993) (per curiam), which held that a section 2255 petitioner is barred from raising sentencing errors in a section 2255 motion that could have been raised on direct appeal without a showing of cause and actual prejudice. The holding of *Suveges* cannot be extended to preclude collateral attack of a conviction on the ground that jurisdiction to hear the matter was lacking due to the unconstitutionality of the statute under which the petitioner was convicted.

federal statute, *id;* second, when the conviction was imposed by a federal court whose jurisdiction over the person or offense was improper, *id;* third, when the trial or sentence violated constitutional protections, *id.* at 178–79, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982. This case falls within the first exception. Collateral attack upon a guilty plea is permissible "where on the face of the record the court had no power to enter the conviction or impose the sentence." *Broce,* 488 U.S. at 569, 109 S.Ct. 757, 102 L.Ed.2d 927.

██ In some cases, even though one of the exceptions applies, the petitioner has been required to raise the claim on direct appeal when an appellate procedure was available for the correction of the error. *See, e.g., Sunal,* 332 U.S. at 179, 67 S.Ct. 1588, ; *Glasgow v. Moyer,* 225 U.S. 420, 429, 32 S.Ct. 753, 56 L.Ed. 1147 (1912); *Toy v. Hopkins,* 212 U.S. 542, 549, 29 S.Ct. 416, 53 L.Ed. 644 (1909). Direct appeal can be a sufficient mechanism to address the validity of the law under which the information was found. *See Glasgow,* 225 U.S. at 430, 32 S.Ct. 753; *cf. Menna,* 423 U.S. at 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975) (holding that a plea of guilty did not waive a challenge to the constitutionality of the prosecution itself and the petitioner could directly appeal in order to challenge the charge on double jeopardy grounds). Nonetheless, in some instances the Supreme Court has permitted the use of the writ of habeas corpus to test the constitutionality of the statute that is the basis of the indictment or information. *See, e.g., In Re Gregory,* 219 U.S. 210, 31 S.Ct. 143, 55 L.Ed. 184 (1911); *In Re Heff,* 197 U.S. 488, 25 S.Ct. 506, 49 L.Ed. 848 (1905), *rev'd on other grounds, United States v. Nice,* 241 U.S. 591,

36 S.Ct. 696, 60 L.Ed. 1192 (1916); *Ex Parte Yarbrough,* 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884); *Ex Parte Curtis,* 106 U.S. 371, 1 S.Ct. 381, 27 L.Ed. 232 (1882); *Ex Parte Siebold,* 100 U.S. 371, 25 L.Ed. 717 (1880); *see also Harper,* 901 F.2d at 472; *Prince,* 868 F.2d at 1383; *United States v. Barboa,* 777 F.2d 1420, 1423 n. 3 (10th Cir. 1985); *cf. Blackledge,* 417 U.S. at 30, 94 S.Ct. 2098. In this case, Fireman did not file a direct appeal of his conviction based on the unconstitutionality of the statute. Given the constitutional implications posed by Fireman's challenge to this Court's jurisdiction, the Court will consider his claim that section 315 of the Federal Election Campaign Act is unconstitutional.[4]

### C. Revisiting *Buckley v. Valeo*[5]

██ This case presents the question of whether FECA's $1000 contribution limitation is too low to allow meaningful participation in protected political speech and association and, therefore, is not narrowly tailored to serve the compelling governmental interest of "the prevention of corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office." *Buckley v. Valeo,* 424 U.S. 1, 25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

At the core of Fireman's argument is his position that the present Supreme Court would conclude that the $1000 contribution limitation upheld in *Buckley* is now unconstitutional because the distinction made between contributions and expenditures is faulty and the limitation ceiling is no longer narrowly tailored in view of the present cost

4. As the Supreme Court has stated:
  The validity of the judgment is assailed on the ground that the act of Congress under which the indictments were found are unconstitutional. If this position is well taken, it affects the foundation of the whole proceedings. An unconstitutional law is void, and is as no law. An offense created by it is not a crime. A conviction under it is not merely erroneous, but is illegal and void, and cannot be a legal cause of imprisonment.
  *Ex Parte Siebold,* 100 U.S. at 376–77, 25 L.Ed. 717.

5. Although Fireman was convicted under several provisions of the FECA, his brief addresses only the $1000 contribution limitation. This, therefore, is the focus of this opinion. The FECA states, in pertinent part, that: "No person shall make contributions to any candidate and his authorized political committee with respect to any election for federal office which, in the aggregate, exceed $1000." 2 U.S.C. § 441a(a)(1)(A).

of campaign publicity. Fireman asserts that the *Buckley* framework was an unreliable precedent to begin with, because it was a plurality opinion whose authority has weakened over time with the change in the composition of the Supreme Court and subsequent opinions by Supreme Court justices indicating their willingness to abrogate the *Buckley* framework. Even were the Court to accept the "predictive demise" argument as an exception to the doctrine of *stare decisis*, an issue upon which this Court expresses no opinion, evaluation of the argument finds it wanting. A majority of the current Supreme Court justices firmly stand behind the *Buckley* framework. Moreover, on this record, Fireman has failed to establish that the $1000 contribution limitation is unreasonably restrictive due to inflation.

### 1. Buckley v. Valeo is not an Outdated Opinion [6]

Fireman argues that this Court ought not consider itself bound by the Supreme Court's decision in *Buckley*, but ought instead assess the $1000 contribution limitation based on this Court's prediction of the Supreme Court's view of its present constitutionality. In support of his position that revisiting the constitutionality of the statute is appropriate, Fireman refers to a recent Supreme Court case, *Colorado Republican Campaign Committee v. Federal Election Commission*, 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996). According to Fireman, "[t]his recent case partially brings to light the split views and dissatisfaction of current Justices as to the adverse and unconstitutional impact of FECA on the First Amendment and indicates that a re-examination of the $1,000 limit on campaign contri-

butions is in order and required." Plt.'s Mem. at 12. In the *Colorado Republican* case, the Supreme Court held, in a plurality opinion, that the First Amendment prohibits application of FECA's party expenditure provision to independent political party spending made without coordination with any candidate.[7] The plurality opinion firmly relies on the principles articulated in *Buckley* regarding individual expenditure limitations to support its position that independent expenditures by political parties do not present the corruption concerns that justify contribution limitations. *Colorado Republican*, 518 U.S. at 614–16, 116 S.Ct. 2309, 135 L.Ed.2d 795.

This opinion does not call *Buckley* into question. Instead, *Colorado Republican* reaffirms the central holding of *Buckley* that contributions and expenditures—i.e., the giving of money and the spending of the money raised—are substantively different. The Court again observed that "restrictions on contributions impose 'only a marginal restriction upon the contributor's ability to engage in free communication,' because the symbolic communicative value of a contribution bears little relation to its size and because such limits leave 'persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources.'" *Id.* at 615, 116 S.Ct. at 2315 (internal citations omitted) (quoting *Buckley*, 424 U.S. at 20–21, 28, 96 S.Ct. 612, 46 L.Ed.2d 659.) Concerning expenditures, however, "the Court has said that restrictions on independent expenditures significantly impair the ability of individuals and groups to engage in

---

6. Contrary to Fireman's assertions, seven Supreme Court justices held constitutional FECA's contribution limitation on individuals supporting a single candidate. Only Justices Burger and Blackmun dissented from the Supreme Court's holding that the $1000 contribution limitation did not violate a contributor's First Amendment rights of freedom of expression and freedom of association. *See Buckley*, 424 U.S. at 235, 290, 96 S.Ct. 612.

7. This opinion addresses an issue not reached in *Buckley:* the constitutionality of FECA's provisions dealing with political parties. In the end,

seven justices held that section 441a(d)(3), as applied to independent political party spending, violates the First Amendment. Four justices (Rehnquist, Scalia, Kennedy, and Thomas) would have gone further than the plurality opinion and found that section 441a(d)(3) on its face is unconstitutional, believing that the issue of coordinated expenditures and independent expenditures by political parties was properly before the Court. For these justices, political party spending is analogous to candidate expenditure and, per *Buckley v. Valeo*, the First Amendment prohibits its regulation.

direct political advocacy and 'represent substantial ... restraints on the quantity and diversity of political speech.'" *Id.* (quoting *Buckley,* 424 U.S. at 19, 96 S.Ct. 612, 46 L.Ed.2d 659). The political quid pro quo concerns that provide a constitutionally sufficient basis to justify contribution limitations and the associated restriction upon political speech are constitutionally insufficient to justify expenditure limitations.

Presently, the only Supreme Court Justice who advocates the replacement of the *Buckley* dichotomy between contributions and expenditures is Justice Thomas. *See Colorado Republican,* 518 U.S. at 634–44, 116 S.Ct. 2309, 135 L.Ed.2d 795 (Thomas, J., concurring in the judgment and dissenting in part). Although Chief Justice Rehnquist and Justice Scalia join parts of Justice Thomas's opinion, they specifically **do not** join the part of his opinion where he rejects the *Buckley* framework and advocates its replacement. *Colorado Republican,* 518 U.S. at 631, 116 S.Ct. 2309, 135 L.Ed.2d 795. Contrary to Fireman's assertions, the Supreme Court has not abrogated the *Buckley* framework nor does *Colorado Republican* extend an invitation to this Court to revisit the statute's constitutionality.

## 2. Difference in Degree or Difference in Kind

Fireman argues that the $1000 contribution limitation can no longer be deemed a narrowly tailored means to meet a compelling governmental end. On the present record, this argument fails. In *Buckley's* discussion regarding the overbreadth challenge to the contribution limitations, the Supreme Court held that the contribution level chosen by Congress is not invalid nor is the Court to select a different limit if the interest underlying the law is constitutionally sufficient and the distinction is one of degree not kind. *See Buckley,* 424 U.S. at 30, 96 S.Ct. 612, 46 L.Ed.2d 659.

To explain its analysis concerning differences in degree versus differences in kind, the Supreme Court cited two of its opinions regarding the constitutional validity of state legislation restricting a voter's freedom to change parties in order to prevent "raiding."

In *Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973), the Supreme Court held that a state law requiring a voter to enroll in the party of her choice thirty days before the general election in order to vote in the next party primary was constitutional. On the other hand, in *Kusper v. Pontikes,* 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973), the Supreme Court held that a state law prohibiting a person from voting in the primary election of a political party if she voted in the primary of any other party within the preceding 23 months was unconstitutional, as it imposed a substantial restraint on her right of free association and was not justified by the government's interest in preventing raiding. The Supreme Court upheld the restriction in *Rosario* because it did not "'lock' a voter into an unwanted pre-existing party affiliation from one primary to the next." *Rosario,* 410 U.S. at 759, 93 S.Ct. 1245, 36 L.Ed.2d 1. Since the legislation in *Kusper* did exactly that, it was different in kind from the legislation at issue in *Rosario.* In *Rosario,* the issue to be considered was "whether the time limitation imposed by [the statute] is so severe as itself to constitute an unconstitutionally onerous burden on the petitioners' exercise of the franchise or on their freedom of political association." *Rosario,* 410 U.S. at 760, 93 S.Ct. 1245, 36 L.Ed.2d 1. The court held the enrollment scheme constitutional despite the long period between the deadline for enrollment and the next primary election, as the governmental interest—to ensure the integrity of the electoral process—was constitutionally sufficient and the enrollment deadline was sufficiently related to this legitimate purpose.

A contribution limitation such as the one at issue here is analogous to the enrollment deadline in *Rosario.* It does not impose an absolute prohibition on campaign contribution but, like the enrollment deadline, requires a court to consider whether the contribution limitation imposed by FECA is so severe as to constitute an unconstitutionally onerous burden on a contributor's freedom of political association or expression. This is the inquiry the Supreme Court made in *Buckley,* concluding that the $1000 limitation

was a matter of degree, not kind, was within Congress' authority to determine, and did not impose a constitutionally onerous burden on a contributor's freedom of expression or association.[8]

True, the Supreme Court also stated, "[C]ontribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." *Buckley,* 424 U.S. at 21–22, 96 S.Ct. 612, 46 L.Ed.2d 659. Building upon this language, Fireman asserts that this Court ought reopen the issue as "the increase in cost of political advertisements since 1976 has resulted in a difference in kind. The effect is now a violation of the First Amendment protection of expression and this Court should so hold." Plt.'s Reply Mem. at 13.

Fireman offers a so-called "expert" affidavit from Alan B. Johnson, Senior Vice President, Director of Media Services for Mullen Advertising in Boston, Massachusetts, to show the changes in market rates for a variety of paid media from 1976 to 1997. Fireman offers this affidavit to show how the cost of inflation has diminished the value of the $1000 contribution. Assessing the present cost of various paid media against the $1000 contribution limitation, it is apparent, Fireman argues, that the cost of reaching the public has changed dramatically since 1976 so that a $1000 contribution limitation established in 1974 is no longer narrowly tailored to meet the government's compelling interest in 1997.

Fireman also cites several federal court opinions concluding that state contribution limitations were too low, constituting a difference in kind from the limits permitted in *Buckley,* and, therefore, impermissibly infringed on an individual's First Amendment rights of expression and association. *See Carver v. Nixon,* 72 F.3d 633, 644 (8th Cir. 1995) (state had failed to provide any evidence to show "why it was necessary to adopt the lowest contribution limits in the nation and restrict First Amendment rights of so many contributors" in order to meet the government's compelling anti-corruption interest); *Day v. Hayes,* 863 F.Supp. 940, 952 (D.Minn.1994) (Magnuson, J.), *aff'd in part, rev'd in part on other grounds,* 34 F.3d 1356 (8th Cir.1994) (holding the $100 limits on individual contribution to a political committee or political fund unconstitutional).

Finally, Fireman quotes from the Supreme Court's decision in *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 295 n. 5, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981), "The value of the right to associate is illustrated by the cost of reaching the public."

None of these arguments is persuasive.

Despite the economic truth of Fireman's affidavit, this Court is reluctant to conclude from this evidence alone that the $1000 contribution limitation has drifted from a difference in degree to a difference in kind. On this record, Fireman's argument regarding the present day impact of the $1000 contribution limitation is speculative. Certainly the language of *Buckley* requires a court to consider how the contribution limitation affects the financing of political campaigns, but such assessment should occur in a evidentiary context of actual figures on costs, contributions, and expenditures in order fully to assess the impact. No evidence has been put forth to show a severe impact on political dialogue or effective advocacy. *See Buckley,* 424 U.S. at 21–22, 96 S.Ct. 612, 46 L.Ed.2d 659. There is no evidence in the record indicating that the present $1000 contribution limitation is causing a "dramatic adverse effect on the funding of campaigns and political associations."

For the *Buckley* court, the cost of different modes of communication was primarily relevant to the consideration of the constitutionality of expenditure limitations, not contribution limitations.

---

8. The Supreme Court's conclusion that the $1000 contribution limitation would not severely impact political dialogue was based, at least in part, on evidence showing that most contributors make contributions of $1000 or less. *See Buckley,* 424 U.S. at 21 n. 23, 26 n. 27, 96 S.Ct. 612.

Statistical findings submitted by the parties established that only 5.1% of the total contributions raised in 1974 were obtained in amounts in excess of $1000. *Buckley,* 424 U.S. at 21, n. 23, 96 S.Ct. 612, 46 L.Ed.2d 659.

The expenditure limitations contained in the Act represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech. The $1,000 ceiling on spending "relative to a clearly identified candidate" would appear to exclude all citizens and groups except candidates, political parties, and the institutional press from any significant use of the most effective modes of communication.

*Id.* at 19, 96 S.Ct. 612, 46 L.Ed.2d 659 (citations omitted). Fireman overlooks this distinction.

While recognizing that contribution limitations do impact freedom of expression, the Supreme Court apparently considers such a limitation to be "only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 20, 96 S.Ct. 612, 46 L.Ed.2d 659. Nowhere in the opinion or in subsequent opinions does the Supreme Court compare the costs of political advertising with the contribution limitations as a rubric for assessing the constitutionality of such limitations. Instead, the Supreme Court recognizes "the important role of contributions in financing political campaigns," *see Buckley,* 424 U.S. at 21, 96 S.Ct. 612, and puts forth general principles to guide analysis of whether a contribution limitation is narrowly tailored to achieve the government's compelling interest.

The evidentiary record in both the *Carver* and the *Day* cases varies considerably from the evidentiary record in *Buckley* and the single affidavit presented in this case. While helpful in demonstrating that some contribution limitations can be found unconstitutional pursuant to *Buckley,* neither of these decisions in any way undermines its holding.

Finally, Fireman's reliance upon the statement in *Citizens Against Rent Control* is misplaced. The language he selects comes from a footnote in the part of the opinion where the Supreme Court is discussing its historical recognition of the value of freedom of association as a vehicle for enabling people to communicate their ideas. It does not support Fireman's proposition that by comparing the costs of advertising with the limits on contributions the constitutional validity of the limitation can be ascertained.

In *Citizens Against Rent Control,* the Supreme Court determined that the governmental interest—to preserve voter confidence in the ballot referendum process—was not compelling and the contribution limitation was not the least restrictive means for achieving that interest. The contribution limitation's impact on the ability to purchase political advertising was not, however, the basis for the Supreme Court's ruling of unconstitutionality. *See Citizens Against Rent Control,* 454 U.S. at 296–99, 102 S.Ct. 434, 70 L.Ed.2d 492. *Citizens Against Rent Control* is not a shift away from the Supreme Court's holding in *Buckley* but a reaffirmation of its underlying tenets.

> *Buckley* identified a single narrow exception to the rule that limits on political activity were contrary to the First Amendment. The exception relates to the perception of undue influence of large contributors to a candidate.... *Buckley* does not support limitations on contributions to committees formed to favor or oppose ballot measures.

*Id.* at 296–97, 102 S.Ct. 434,

For this reason, as well as the fact that the Supreme Court does not appear to be moving away from the *Buckley* framework, this Court **DENIES** Fireman's section 2255 petition.