**Scott DAY, Treasurer of IMPACE–MEA; IMPACE–MEA; and Steve Frazier and Richard Kimbler, Plaintiffs,**

v.

**Vanne Owens HAYES, in her capacity as Chair of the Ethical Practices Board, Defendant.**

**MINNESOTA CITIZENS CONCERNED FOR LIFE, INC.; Jacqueline A. Schwietz, Treasurer of Minnesota Citizens Concerned for Life Committee for State Pro–Life Candidates; Eileen Angell, Mitchell Hoyt Unruh, and Lori Erickson, Plaintiffs,**

v.

**Vanne Owens HAYES, as Chair of the State Ethical Practices Board; and Hubert Humphrey III, as Attorney General of the State of Minnesota, Defendants.**

Civ. Nos. 3–93–857, 3–93–876.

United States District Court,
D. Minnesota,
Third Division.

May 27, 1994.

---

Eric Raymond Miller, Oppenheimer Wolff & Donnelly, Harley M. Ogata, MN Educ. Assoc., St. Paul, MN, for plaintiffs.

Jocelyn Furtwangler Olson, Minnesota Atty. Gen., St. Paul, MN, for defendant.

## MEMORANDUM & ORDER

MAGNUSON, District Judge.

This matter is before the Court upon Plaintiffs' Motions for Summary Judgment. The Court has given these motions expedited consideration due to the significant implications of the challenged statutes in the imminent Minnesota primary and general elections. For the following reasons, the Court grants the motions in part and denies them in part and enters partial judgment in favor of the Plaintiffs and partial judgment in favor of the Defendants.

## BACKGROUND

Responding to concerns about the financing of political campaigns and the potential for and perception of corruption of the political process through undue influence of large financial contributors, the 1993 Minnesota Legislature significantly amended state laws governing political campaigns and the financing of those campaigns.[1] The new statute,

---

1. The parties disagree about the intent of the Legislature in enacting the new laws. Each side cites legislative history that it contends shows the intent of the Legislature in enacting the law. Plaintiffs rely primarily on statements made in committee hearings by the principal Senate author of the bill, Senator John Marty. Statements by a single senator in a hearing before a committee of a single body of a bicameral legislature are insufficient to demonstrate the collective intent of the entire legislature in subsequently enacting the final version of a bill. It is admittedly difficult to glean the intent of the enacting legislature from the legislative record before the Court. However, based on the entire record, including but not limited to the text of the bill; available legislative history, background information and documents; and the present representations and arguments of the executive branch of Minnesota government; the Court concludes that it appears the intent of the enacting legislature was to reduce the potential for corruption and the appearance of corruption in the political processes.

Even if this Court were to somehow determine that the small minority of senators quoted in the

*inter alia*, (i) provides incentives for candidates to accept voluntary spending limits including public subsidies to candidates who accept the limits and meet other eligibility criteria; (ii) reduces the amounts of contributions candidates may accept from political committees, political funds, lobbyists and certain individuals; (iii) limits the amount of contributions a political committee or fund may accept from a single donor in a year; (iv) imposes reporting requirements on persons and entities making "independent expenditures" and (v) provides for public subsidies to some candidates who have such independent expenditures made against them. *See* Minn.Stat. Chapter 10A (Supp.1993) (scattered provisions). The 1993 Legislature also amended Minn.Stat. § 211B.15, a statute that prohibits corporations from making certain types of campaign contributions and expenditures. Plaintiff MCCL, Inc. challenges several provisions of the statute as amended.

The Plaintiffs brought suit seeking to invalidate several provisions of the above-described laws on December 20, 1993.[2] They challenge the constitutionality of provisions of the law that require reporting of independent expenditures and provide for corresponding subsidies to candidates who meet certain conditions; a provision limiting individual contributions to political funds and committees to $100 per year; and the corporate contribution and expenditure prohibitions, as applied to Plaintiff MCCL, Inc. Both groups of Plaintiffs seek declaratory judgment that the challenged provisions of Minn.Stat. § 10A violate the First and Fourteenth Amendments to the United States Constitution and seek to permanently enjoin the Defendants from enforcing the challenged statutes. In addition, Plaintiff MCCL, Inc. seeks a declaration that Minn. Stat. § 211B (the "Campaign Act") is unconstitutional and seeks to enjoin Defendants from enforcing the statute against it. The Court denied the Plaintiffs' motions for preliminary injunction on January 5, 1994. Both groups of Plaintiffs now seek summary judgment.

## DISCUSSION

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.,* 980 F.2d 1217, 1219–20 (8th Cir.1992). A court may grant summary judgment in favor of a non-moving party. *See Hvamstad v. Suhler,* 727 F.Supp. 511 (D.Minn.1989), *aff'd,* 915 F.2d 1218 (8th Cir.1990); *see also, Celotex,* 477 U.S. at 326, 106 S.Ct. at 2554 ("[D]istrict

Plaintiffs' supporting materials spoke for the entire Legislature, their comments are insufficient to show that the Legislature acted with the intent of suppressing the First Amendment rights of the Plaintiffs. *Cf. Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (in different context (equal protection), Court held that, in order to invalidate as improperly motivated a facially neutral legislative scheme, a Plaintiff must show that "a state legislature selected or affirmed a particular course of action at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group.")

**2.** Plaintiffs in Civil File No. 3–93–857 are IMPACE–MEA, the registered political fund of the Minnesota Education Association; Scott Day, the Treasurer of IMPACE–MEA; Steve Frazier, a Minnesota taxpayer and contributor to IMPACE–MEA; and Richard Kimbler, a candidate for Minnesota Secretary of State (where appropriate, the Court occasionally refers to the Plaintiffs in this action collectively as "IMPACE"). The Defendant in that action is Vanne Owens Hayes, sued in her capacity as Chair of the Minnesota Board of Ethical Practices. Plaintiffs in Civil

File No. 3–93–876 are Minnesota Citizens Concerned for Life, Inc. (MCCL); Minnesota Citizens Concerned for Life Committee for State Pro–Life Candidates (MCCLSPC), a registered political fund of MCCL; Jacqueline A. Schwietz, the Treasurer of MCCLSPC; Eileen Angell, a resident of Minnesota and contributor to MCCLSPC; Lori Erickson, a Minnesota resident who intends to run for election to the Minnesota Senate and to be bound by the campaign expenditure limits of the challenged statutes; and Mitchell Hoyt Unruh, who intends to run for the Minnesota House and be bound by the same limits (where appropriate, the Court occasionally refers to the Plaintiffs in this action collectively as "MCCL"). The Defendants in that action are Vanne Owens Hayes and Hubert H. Humphrey III, sued in his capacity as Attorney General of the State of Minnesota. Because the actions pose related challenges to the new laws, the Court considers the two actions together. Except where otherwise noted, the Court shall refer to all plaintiffs in both actions collectively as "Plaintiffs" and to both defendants as "Defendants."

courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence.") The parties are in agreement as to essentially all material facts and have agreed that this matter should be decided in summary fashion based on the existing record. *See Johnson v. Bismarck Public School Dist.,* 949 F.2d 1000, 1004–05 (8th Cir.1991) (when parties agree that issues should be decided in summary fashion, judgment in favor of either moving party or nonmoving party is permissible). Hence, the Court's task here is to determine questions of law and enter judgment in this matter.

## I. Justiciability [3]

At the time of the Court's denial of Plaintiffs' motions for preliminary injunction, it was not clear that the Plaintiffs had alleged sufficient interests and facts to confer standing and to make the case ripe for this Court's review. In the interim, Plaintiffs have remedied those arguable deficiencies by adding several individual Plaintiffs and by alleging facts sufficient to show that candidates they oppose will likely be eligible for public subsidy in the coming election cycle. However, it bears repeating that the mere making and reporting of an independent expenditure by a person or group opposed to a candidate is not sufficient to qualify that candidate for a public subsidy. In order to qualify for a public subsidy based on an independent expenditure made against her, a candidate must have previously accepted voluntary spending limits, must meet public subsidy eligibility requirements, and must have raised twice the minimum match otherwise required. *See* Minn.Stat. § 10A.25 subd. 13.[4]

Plaintiff Steve Frazier contends he is entitled to challenge this law both as a taxpayer and as an ordinary citizen. Frazier argues that Minn.Stat. § 10A.25 violates his First Amendment rights by effectively forcing him to subsidize a candidate he opposes through government expenditure of funds it obtains through the state income tax. Because Frazier is a Minnesota taxpayer, he contributes to the collective pool of state funds whence the State would draw funds to pay subsidies to eligible candidates under Chapter 10A.

Generally, suits based on taxpayer status and ideological injury arising from that status are not cognizable in federal court. *See ASARCO, Inc. v. Kadish,* 490 U.S. 605, 613, 109 S.Ct. 2037, 2043, 104 L.Ed.2d 696 (1989). Taxpayers are generally not allowed to bring suits to challenge laws of general applicability based on their taxpayer status because their injury is not separate and "distinct from that suffered by other taxpayers ..." *Id.* The Supreme Court carved an exception to the prohibition on such "taxpayer standing" in *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). However, subsequent cases have effectively delineated the very narrow scope of that exception—the Supreme Court has found taxpayer standing *only* when the taxpayer challenges government spending alleged to violate the Establishment Clause of the First Amendment. It has rejected taxpayer standing in every other case originally brought in federal court. *See, e.g., United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Valley Forge Christian College v. Americans United for Sep. of Church & State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *see also Bowen v. Kendrick,* 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988); *Marsh v. Chambers,* 463 U.S. 783,

**3.** The Defendants originally contended Plaintiff MCCL, Inc. lacked standing to bring its challenge to Minn.Stat. § 211B because its articles of incorporation prohibited it from participating in political campaigns. However, the Defendants later determined that MCCL, Inc. (MCCL) had repealed that provision of its articles of incorporation. Accordingly, the Defendants withdrew their argument that MCCL lacked standing to challenged Section 211B. The Court agrees with the Defendants' assessment and will thus consider the merits of MCCL's Section 211B challenge. *See infra* at IV.

**4.** Similarly, the increased expenditure ceiling provided by Minn.Stat. § 10A.25 subd. 13(a) applies to only those candidates who have voluntarily accepted the expenditure limits in the first instance *and* whose major party opponent also agrees to be bound by the voluntary limits. *See* Minn.Stat. § 10A.25 subd. 10 (Supp.1993).

103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (establishment clause challenges); *cf. ASARCO,* 490 U.S. at 616–24, 109 S.Ct. at 2044–49 (1989) (allowing standing for Supreme Court review of action brought in state court, though standing would not exist if action originally brought in federal court).

Frazier does not allege an injury arising from the challenged statutes that is distinguishable from the generalized injury suffered by innumerable taxpayers who disagree with government expenditures of tax-generated funds. As the Supreme Court noted more than seventy years ago, suits based on a taxpayer's generalized grievance are not justiciable in federal court because the taxpayer's

> interest in the moneys of the Treasury—partly realized from taxation and partly from other sources—is shared with millions of others, is comparatively minute and indeterminable; and the effect upon future taxation, of any payments out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for [judicial intervention].

*Frothingham v. Mellon,* 262 U.S. 447, 487, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923). Further, Frazier does not allege that the challenged statutes violate the Establishment Clause of the First Amendment and thus does not fit within the narrow exception to the general prohibition against taxpayer standing. Accordingly, the Court finds Frazier lacks taxpayer standing.

Frazier more likely has general citizen standing to challenge Chapter 10A, because he is a member of and contributor to IM-PACE–MEA. However, his challenge based on that status is indistinguishable from the challenge brought by other individual parties to these suits and the Court need not separately discuss that aspect of Frazier's challenge.

**5.** The IMPACE Plaintiffs also contend that the challenged provisions of Chapter 10A violate Art. 1, Sec. 3 of the Minnesota Constitution. However, Plaintiffs do not argue that the protections afforded by the Minnesota Constitution are different from those provided by the First Amendment to the United States Constitution and offer

## II. Independent Expenditures Provisions [5]

Plaintiffs challenge the "independent expenditures" provisions of Chapter 10A, which provide, in pertinent part:

**Subd. 6b. Independent expenditures; notice.**

(a) Within 24 hours after an individual, political committee, or political fund makes or becomes obligated by oral or written agreement to make an independent expenditure in excess of $100, other than an expenditure by an association targeted to inform solely its own dues-paying members of the association's position on a candidate, the individual, political committee, or political fund shall file with the board an affidavit notifying the board of the intent to make the independent expenditure and serve a copy of the affidavit on each candidate in the affected race and on the treasurer of the candidate's principal campaign committee. The affidavit must contain the information with respect to the expenditure that is required to be reported under subdivision 3, paragraph (g); except that if an expenditure is reported before it is made, the notice must include a reasonable estimate of the anticipated amount. Each new expenditure requires a new notice.

(b) An individual or the treasurer of a political committee or political fund who fails to give notice as required by this subdivision, or who files a false affidavit of notice, is guilty of a gross misdemeanor and is subject to a civil fine of up to four times the amount of the independent expenditure stated in the notice or of which notice was required, whichever is greater.

Minn.Stat. § 10A.20 subd. 6b (Supp.1993).

**Subd. 13. Independent expenditures; limits increased.**

(a) The expenditure limits in this section are increased by the sum of independent expenditures made in opposition to a can-

no separate analysis of the application of the Minnesota Constitution to the statutes at issue. The Court will assume for purposes of this analysis that the reach and protections of Minn. Const. Art. 1, Sec. 3 are co-extensive with those of U.S. Const. Am. 1.

didate plus independent expenditures made on behalf of the candidate's major political party opponents, other than expenditures by an association targeted to inform solely its own dues-paying members of the association's position on a candidate.

(b) Within 48 hours after receipt of an expenditure report or notice required by section 10A.20, subdivision 3, 6, or 6b, the board shall notify each candidate in the race of the increase in the expenditure limit for the candidates against whom the independent expenditures have been made.

(c) Within three days after providing this notice, the board shall pay each candidate against whom the independent expenditures have been made, if the candidate is eligible to receive a public subsidy and has raised twice the minimum match required, an additional public subsidy equal to one-half the independent expenditures. The amount needed to pay the additional public subsidy under this subdivision is appropriated from the general fund to the board.

Minn.Stat. § 10A.25 subd. 13 (Supp.1993).

**Subd. 10b. Independent expenditure.** "Independent expenditure" means an expenditure expressly advocating the election or defeat of a clearly identified candidate, which expenditure is made without the express or implied consent, authorization, or cooperation of, and not in concert with or at the request or suggestion of, any candidate or any candidate's principal campaign committee or agent. An independent expenditure is not a contribution to that candidate. An expenditure by a political party or political party unit, as defined in section 10A.275, subdivision 3, in a race where the political party has a candidate on the ballot is not an independent expenditure.

Minn.Stat. § 10A.01 Subd. 10b (Supp.1993).

*A. Restriction or Burden on Free Speech*

■ The Plaintiffs contend that the independent expenditures statute is unconstitutional because it burdens their exercise of free speech rights. In support of this con-

tention, Plaintiffs argue that, through the statute's subsidy and increased expenditure provisions, the Government will force Plaintiffs to subsidize the speech of a candidate they oppose as the price of independent expenditures in favor of a candidate they support. *See* Minn.Stat. § 10A.25 subd. 13 (Supp.1993). Stated differently, Plaintiffs contend they are faced with a choice "between not speaking or subsidizing the campaign coffers of the candidate being opposed" and argue that difficult choice impermissibly burdens their exercise of free speech rights.

Plaintiffs' argument that if they decide to make independent expenditures they will be forced to subsidize the speech of their opponents misperceives the nature of the subsidy provided by the statute. Unlike the governmental regulations struck down in *Miami Herald* and *Pacific Gas & Electric,* which forced private entities to fund the speech of their opponents directly through expenditure of their own private funds, the present statute provides for a *public* subsidy to opponents of candidates supported by the Plaintiffs. *See Pacific Gas & Elec. v. Public Utilities Comm'n of California,* 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986); *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 256, 94 S.Ct. 2831, 2838–39, 41 L.Ed.2d 730 (1974). The Supreme Court made it clear in *Pacific Gas* that content-neutral, public subsidies of political speech are permissible. *Pacific Gas,* 475 U.S. at 14–15, 106 S.Ct. at 910–11. The flaw in the government regulation of speech in *Pacific Gas* was that it

identifie[d] a favored speaker based on the identity of the interests that [the speaker] may represent ... and force[d] the speaker's opponent—not the taxpaying public— to assist in disseminating the speaker's message. Such a requirement necessarily burdens the expression of the disfavored speaker.

*Id.* at 15, 106 S.Ct. at 911 (citations omitted). The present statute is content neutral. Any subsidy or increase in expenditure limits is triggered solely by the event of an independent expenditure, regardless of the interest of the speaker or the content of the speaker's message. Further, the entity making the

independent expenditure is not forced to expend its own private resources to facilitate the expression of an opposing viewpoint.

Contrary to the arguments of the Plaintiffs, the law imposes no restrictions on their ability to make independent expenditures. The independent expenditures law imposes no limit on the amount a person or entity may spend and does not otherwise constrain Plaintiffs' exercise of protected speech rights. It merely provides that, under some conditions, an opposing candidate may be entitled to spend additional amounts on his own campaign message and that he may also be entitled to an additional public subsidy. Plaintiffs are free to make as many independent expenditures as they desire without restraint, censure or penalty by the Government. The independent expenditures law imposes no significant restriction on the Plaintiffs' speech.[6] Instead, the law merely provides that, in certain limited circumstances, independent expenditures may trigger an opportunity for an opponent to respond using public funds, additional private funds or both.

■ Plaintiffs' contention that the public subsidy provision unfairly advantages the opposing candidate or constitutes an improper use of public funds is equally unavailing. The government has no obligation to subsidize all speech equally. *See Regan v. Taxation with Representation of Washington,* 461 U.S. 540, 546–47, 103 S.Ct. 1997, 2001–02, 76 L.Ed.2d 129. If the subsidy is content-neutral, government's decision to subsidize only certain speech does not abridge the First Amendment rights of those who do not receive the subsidy. *Regan,* 461 U.S. at 546, 103 S.Ct. at 2001 (1983); *see Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); *Planned Parenthood v. Agency for Int'l Dev.,* 915 F.2d 59 (2d Cir. 1990), *cert. denied,* 500 U.S. 952, 111 S.Ct. 2257, 114 L.Ed.2d 709 (1991). In the present case, in furtherance of what it believes is the public interest, the Government has chosen to subsidize the speech of candidates against whom independent expenditures are made while refusing to subsidize the speech of persons and entities that make independent expenditures. Because the subsidies are content-neutral and not "aimed at the suppression of dangerous ideas," they do not run afoul of the guarantees of the First Amendment. *Regan,* 461 U.S. at 550, 103 S.Ct. at 2003.

■ The independent reporting and subsidy provisions of the statute may make the Plaintiffs' strategic decisions regarding independent expenditures and weighing their possible consequences more difficult. However, the First Amendment does not guarantee the Plaintiffs freedom from difficult choices. A government regulation which forces a civic organization to make a difficult choice with respect to the exercise of constitutional rights does not, without more, violate the organization's First Amendment rights. *See Brookins v. O'Bannon,* 699 F.2d 648 (3d Cir.1983). Here, though the independent expenditures statute may in some circumstances create a dilemma for the Plaintiffs, they have not shown that such a dilemma would impermissibly restrict their First Amendment rights.

Because the independent expenditure provisions would facilitate more speech in some circumstances, they may actually advance core values underlying the First Amendment. A primary purpose of the First Amendment is "to secure the widest possible dissemination of information from diverse and antagonistic sources." *New York Times Co. v. Sullivan,* 376 U.S. 254, 266, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964); *see Red Lion Broadcasting Co. v. Fed. Communications Comm'n,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). To the extent the statute provides for increased debate about issues of public concern raised by an independent expenditure, it promotes the free and open debate the First Amendment seeks to foster and protect. *See id.; cf. Buckley v. Valeo,* 424 U.S. 1, 92–93, 96 S.Ct. 612, 669–70, 46 L.Ed.2d 659 (1976) (public financing of cam-

---

**6.** Plaintiffs do not argue that the independent expenditure reporting requirements would impose a heavy or costly administrative burden that would chill their exercise of their First Amendment rights. *Cf. Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 656–60, 110 S.Ct. 1391, 1396–97, 108 L.Ed.2d 652 (1990).

paigns "furthers, not abridges, pertinent First Amendment values"). The Court concludes that the independent expenditures provisions of the statute do not constitute an unconstitutional burden on free speech.

### B. Vagueness and Overbreadth Challenges

#### 1. Vagueness

■ Plaintiffs also contend that the independent expenditures notice provisions should be declared void for vagueness. Due process requires that a law whose violation is punishable by criminal penalty must state clearly what conduct it requires or prohibits. *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). A penal statute that fails to define the criminal offense clearly in terms understandable by ordinary people, is "void-for-vagueness" because it violates constitutional due process requirements. *Id.* at 357, 103 S.Ct. at 1858. The vagueness doctrine and underlying due process concerns are implicated here because the independent expenditures notice statute provides that failure to comply with the requirements of the statute is punishable as a gross misdemeanor, *see* Minn.Stat. § 10A.20 subd. 6b(b), and because the statute regulates expressive activity.

■ The independent expenditures notice provision essentially provides the mechanism through which the Ethical Practices Board (Board) would determine when a candidate—who meets all the other necessary preconditions—is eligible for additional public or private funding on the basis of an independent expenditure made on behalf of his or her opponent. For purposes of the vagueness dispute, the notice obligation is set forth in the following section:

Subd. 6b. Independent expenditures; notice. (a) Within 24 hours after an individual, political committee, or political fund makes or becomes obligated by oral or written agreement to make an independent expenditure in excess of $100 ... the [obligor] shall file with the board an affidavit notifying the board of the intent to make the independent expenditure and serve a copy of the affidavit on each candidate in the affected race and on the treasurer of

the candidate's principal campaign committee ... [I]f an expenditure is reported before it is made, the notice must include a reasonable estimate of the anticipated amount. Each new expenditure requires a new notice.

(b) An individual or the treasurer of a political committee or political fund who fails to give notice as required by this subdivision, or who files a false affidavit of notice, is guilty of a gross misdemeanor and is subject to a civil fine of up to four times the amount of the independent expenditure stated in the notice or of which notice was required, whichever is greater.

Minn.Stat. § 10A.20 subd. 6b (Supp.1993).

Plaintiffs assert that the phrase "becomes obligated by written or oral agreement to make an independent expenditure" is so indefinite that they are unable to determine their reporting obligations under the statute. They argue that the nature of independent political expenditures and the imprecision of the term "obligated" make it impossible to determine when they are required to report the independent expenditures to the Board. They conclude that they are subject to risk of penal sanction without adequate notice of what is necessary to conform their conduct to the requirements of the statute.

The Plaintiffs' vagueness challenge to the independent expenditures reporting procedure presents a somewhat closer question than their challenges to the more substantive provisions of the law. *See supra,* II.A. The language of the independent expenditure reporting requirements might have been written more clearly or with greater precision. However, because the Legislature is necessarily confined to words to express the requirements of the law, the Court cannot expect the parameters of the law to be delineated with mathematical precision or certainty. *See Ward v. Rock Against Racism,* 491 U.S. 781, 794, 109 S.Ct. 2746, 2755, 105 L.Ed.2d 661 (1989); *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972). Whether this Court or the Plaintiffs might have written the statute differently is not the standard that guides the Court's review. The proper inquiry is whether the

language of statute as enacted is sufficiently definite to allow ordinary citizens to understand what is required of them and to discourage arbitrary and discriminatory enforcement. *See Kolender,* 461 U.S. at 357, 103 S.Ct. at 1858; *Grayned,* 408 U.S. 104, 92 S.Ct. 2294. The Court concludes that, under the due process analysis and standards articulated in *Kolender* and its antecedents, Plaintiffs' vagueness challenge must fail.

The existence of a legal obligation is readily determined by common experience and the application of well-established principles of contract law and related equitable principles.[7] Whether an obligation exists between a person or entity making an independent expenditure and the provider of a good or service in exchange for that expenditure does not require speculation or more sophistication or experience than that of an ordinary consumer—either a person is legally obligated to make an expenditure or she is not.[8]

Political funds and committees like MCCLCSPC and IMPACE–MEA have a higher degree of sophistication and experience in matters of political expenditures and obligations than the ordinary person. In light of that experience, their contention that they would be unable to determine whether or when they become obligated to make an expenditure lacks credibility. Certainly the public media and vendors of other goods and services related to political communications would be unwilling to provide such services if they believed that purchasers of those goods and services would seriously contend they were unable to determine if they had incurred an obligation to pay for those services. The creation of a binding obligation provides a clear line of demarcation between negotiations and discussions regarding independent expenditures, which entities have no duty to report, and the conclusive decision to make an independent expenditure, which they must report. If, for example, a political committee contemplates an independent expenditure and discusses the *possibility* of making such an expenditure with a vendor, but enters no binding agreement, the committee is not *obligated* to make such an expenditure and, under the terms of the statute, the reporting requirement is not triggered.

Several of the Plaintiffs' vagueness arguments fail to distinguish between the *timing* of the creation of an obligation and the objective existence of an obligation. The Court understands that the nature of political campaigns in general, and independent expenditures in particular, makes the timing of decisions regarding the creation of obligations to make such expenditures unpredictable and uncertain. In some cases, the creation of an obligation to make an expenditure and the actual expenditure may occur nearly simultaneously. Further, for a variety of reasons, a person or entity may plan to make an independent expenditure and later decide not to make that expenditure. However, the timing of the ultimate decision regarding an independent expenditure does not determine whether an entity is obligated to make such an expenditure. Similarly, if an entity enters a binding obligation to make an independent expenditure and later for its own reasons

---

**7.** It is reasonable to assume the statute refers to a legal obligation, because the State is without authority to determine the existence of a moral obligation or to attempt to enforce any variety of obligation not grounded in statutory or common law. The Court also notes that none of the Plaintiffs suggests that the alternative event triggering a reporting obligation, the actual making of an independent expenditure, should be held void for vagueness.

**8.** The individual Plaintiffs do not allege their right to make independent expenditures directly in their capacity as individuals is infringed by the reporting requirement or that the reporting requirement as applied to individuals should be held void for vagueness. The individual Plaintiffs have not alleged sufficient facts to confer standing to bring such a challenge. However, even if such a challenge were appropriately presented in this action, the Court doubts the individual Plaintiffs could prevail. In the course of daily life, people enter various transactions and oral and written agreements creating binding obligations. The conduct of commerce depends on ordinary consumers and merchants understanding the nature of obligations—including obligations to make expenditures—and how and when those obligations arise. Although possibly somewhat less sophisticated than a political fund or organization, a person of ordinary experience understands when she is legally "obligated." Therefore, the language of the statute is likely not impermissibly vague on its face, even with respect to its application to individuals.

decides not to publish (in the broad sense) the good or service procured by the expenditure, the obligation still exists.[9]

The existence of an obligation is not vague or indeterminate. People of ordinary experience and intelligence understand when they have entered an obligation; a law imposing reporting requirements on those who enter independent expenditure obligations does not require them to guess at its meaning or expose them to the risk of penalty without fair warning. *See Kolender,* 461 U.S. 352, 103 S.Ct. 1855 (1983); *Grayned,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2300 (1972); *Rowan v. United States Post Office Dept.,* 397 U.S. 728, 740, 90 S.Ct. 1484, 1492–93, 25 L.Ed.2d 736 (1970).

Further, if Plaintiffs or similarly situated entities or individuals actually were unable to determine whether particular events or circumstances triggered a reporting obligation, they could request an advisory opinion from the Board to resolve their dilemma. Minn. Stat. § 10A.02 subd. 12 provides a mechanism whereby persons subject to the requirements of the independent expenditures statute may seek an advisory opinion to guide their conduct, "based upon real or hypothetical situations." [10] The United States Supreme Court suggested that such an advisory opinion mechanism could alleviate vagueness problems, if that mechanism were available to all those who are subject to the requirements of the campaign finance law. *Buckley v. Valeo,* 424 U.S. 1, 40 n. 47, 96 S.Ct. 612, 645 n. 47, 46 L.Ed.2d 659 (1986). After Congress amended the statute at issue in *Buckley* to make the advisory opinion procedure available to all "persons," the D.C.Circuit opined that mechanism would substantially reduce whatever "chill" of free speech

rights exercise might be induced by arguable vagueness of the language of the law. *Martin Tractor v. FEC,* 627 F.2d 375, 384–86 (D.C.Cir.1980); *see also, United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers,* 413 U.S. 548, 580, 93 S.Ct. 2880, 2897–98, 37 L.Ed.2d 796 (1973). Finally, this Court, reviewing the same advisory opinion mechanism's application to a different provision of Chapter 10A, held that mechanism could serve to alleviate vagueness problems. *See Bang v. Chase,* 442 F.Supp. 758, 769–70, including n. 33 (D.Minn.1977), *aff'd,* 436 U.S. 941, 98 S.Ct. 2840, 56 L.Ed.2d 782 (1978). After reviewing three advisory opinions issued by the Board pursuant to Section 10A.02 subd. 12, the Court concluded that those opinions eliminated the arguable vagueness of the challenged statute. *Id.*

The challenged statutes are not unconstitutionally vague. The substantive provisions of the statute alone are sufficiently clear and definite to satisfy the requirements of due process and the First Amendment. The ready availability of authoritative advisory opinions serves to eliminate any residual concern or confusion Plaintiffs may have regarding the application of the statute and their obligations thereunder.

### 2. Overbreadth

■ In a related objection, Plaintiffs contend that the reporting requirement may compel them to report obligations to make expenditures which are not ultimately translated into published political speech in favor of a candidate. The Court interprets this complaint to state a modified "overbreadth" or "overinclusiveness" argument that also incorporates other objections previously discussed. The Plaintiffs essentially argue that

---

**9.** For example, if a political committee contracts with a public relations firm to pay to have campaign flyers promoting a specific candidate printed and distributed and, after the flyers are printed, the committee decides not to distribute those flyers, the binding obligation created by the contract remains. Presumably, the obligation would trigger the statute's reporting requirements even though ultimately it did not result in public expressive activity on behalf of the candidate.

**10.** The advisory opinion section provides, in pertinent part:

> The [ethical practices] board may issue and publish advisory opinions on the requirements of this chapter based upon real or hypothetical situations. An application for an advisory opinion may be made only by an individual or association who wishes to use the opinion to guide the individual's or the association's own conduct. The board shall issue written opinions on all such questions submitted to it within 30 days after receipt of written application, unless a majority of the board agrees to extend the time limit. . . .

Minn.Stat. § 10A.02 subd. 12 (Supp.1993).

due to their failure to translate obligations to speech, their political opponents may be aided by an additional government subsidy when the candidate Plaintiffs support has received no benefit from the expenditure or obligation. This, they apparently conclude, constitutes an overbroad regulation of their political speech because it subsidizes their opponent and effectively penalizes them for speech they did not make. The Supreme Court has emphasized the limited application of the overbreadth doctrine, stating "particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973).

The Plaintiffs' hybrid argument fails for two reasons. Initially, the Court previously concluded that the independent expenditures provisions do not burden the Plaintiffs' exercise of rights guaranteed by the First Amendment. The reporting requirement does not restrict Plaintiffs' freedom to make independent expenditures—they remain free to make or not make whatever expenditures they wish. Plaintiffs offer no argument to suggest that the law would burden the exercise of First Amendment rights of others not before the Court. Because neither the Plaintiffs' nor any other citizen's First Amendment rights are burdened by the reporting requirement, overbreadth analysis is not appropriate. Second, as previously discussed, the Government has no obligation to subsidize various types of expression equally, so long as the subsidy scheme is content-neutral. *See Regan v. Taxation with Representation,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); *Pacific Gas & Elec. v. Public Utilities Comm'n of California,* 475 U.S. 1, 15–16, 106 S.Ct. 903, 911–12, 89 L.Ed.2d 1 (1986). The fact that the triggering event for government subsidy of a candidate's campaign expression may or may not correlate with an actual expenditure in support of that candidate's opponent is not relevant to the principles expressed in *Regan* and its progeny. Plaintiffs have not shown that the independent expenditures provisions of the statute are overbroad.

## III. $100 Contribution Limit

■ Plaintiffs MCCLCSPC and its member/officers (collectively MCCLCSPC) also contend that the $100 contribution limit imposed by Minn.Stat. § 10A.27 subd. 12 impermissibly infringes their right of free association guaranteed by the First Amendment and violates the Fourteenth Amendment guarantee of equal protection of the laws. The law provides:

> **Subd. 12. Contributions to other political committees or funds.** The treasurer of a political committee or political fund, other than a candidate's principal campaign committee or a political party unit as defined in section 10A.275, shall not permit the political committee or political fund to accept aggregate contributions from an individual, political committee, or political fund in an amount more than $100 a year.

Minn.Stat. § 10A.27 subd. 12.

The Court agrees that the contribution limit restricts freedom of association. However, under the analysis set forth in *Buckley,* even a significant government interference with rights of political association may be sustained if it is justified by an important government interest and if it employs means narrowly drawn to avoid needless infringement of associational freedoms. *Buckley,* 424 U.S. at 25–26, 96 S.Ct. at 637–38 (1976). The Supreme Court extended the rule announced in *Buckley* to multicandidate political committees like Plaintiff MCCLCSPC in *California Med. Ass'n v. Fed. Elections Comm'n,* 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981). The government regulations approved in *Buckley* and *California Med. Ass'n* were political contribution ceilings similar in design and intent to the limit imposed by Minn.Stat. § 10A.27 subd. 12.

As in *Buckley,* a primary concern of the Minnesota Legislature in enacting this statute was prevention of the appearance and reality of corruption of the political process through the exercise of undue and improper influence by persons and entities making large financial contributions. The legislative history suggests that the Legislature also intended the contribution limit to restore and

maintain citizens' confidence in their government and elected officials. "Preserving the integrity of the electoral process [and] preventing corruption ... are interests of the highest importance. Preservation of the individual citizen's confidence in government is equally important." *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 788–89, 98 S.Ct. 1407, 1422–23, 55 L.Ed.2d 707 (1978) (citations omitted). Based on the entire record, *see* n. 1, *supra,* the Court concludes that the Defendants have shown that the contribution limit is supported by compelling government interests.

The Government must also show the contribution limit is narrowly tailored to serve those compelling interests and to avoid unnecessary infringement of associational freedoms. *Buckley,* 424 U.S. at 25–26, 96 S.Ct. at 637–38. In its prior order denying Plaintiff's request for injunctive relief, the Court determined that the relatively low limit on monetary contributions did not offend the rights of association implicit in the First Amendment. *See* Memorandum and Order dated January 5, 1994; *see also NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170–71, 2 L.Ed.2d 1488 (1958). Further review of the record, economic data and relevant case law compels the Court to conclude the limit is too low to pass constitutional muster.

The *Buckley* Court held that, as long as a reviewing court is satisfied that some limit on contributions is necessary, it need not determine the precise amount which will effectuate the government's important interest. *Buckley,* 424 U.S. at 30, 96 S.Ct. at 640. The Court further noted that differences in degree of regulation may be significant if they amount to "differences in kind." *Id.* (citations omitted). With respect to contribution limits, the "kind" of regulation at issue in *Buckley* and virtually all subsequent reported federal cases is a limit which discourages the potential for, "actuality and appearance of corruption [of the political process] resulting from *large* individual financial contributions" *Buckley,* 424 U.S. at 26, 96 S.Ct. at 638 (emphasis added). Here, the Court finds that the $100 limit is so low that it renders the limit "different in kind" from those previously upheld by other federal courts and concludes that the limit is not narrowly tailored to serve the government's compelling interest.

The Court has reviewed several post-*Buckley* cases in which courts upheld limits on contributions to multi-candidate political committees. None of those cases upheld a limit below $1000. *See California Med. Ass'n v. FEC,* 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (upholding $5000 annual limit on contributions to political committees); *Mintz v. Barthelemy,* 722 F.Supp. 273, 281–82 (E.D.La.1989), *aff'd,* 891 F.2d 520 (5th Cir.1989) (upholding $5000 contribution limit for local mayoral election); *Mott v. FEC,* 494 F.Supp. 131 (D.D.C.1980) ($5000 contribution limit upheld); *Matter of Vandelinde,* 179 W.Va. 183, 366 S.E.2d 631, 636 (1988) (upholding $1000 contribution limit); *Florida Police Benevolent Ass'n v. Florida Election Comm'n,* 430 So.2d 483 (Fla.Dist.Ct. App.) (1983) ($1000 contribution limit upheld); *cf. Gard v. Wisconsin State Elections Bd.,* 156 Wis.2d 28, 456 N.W.2d 809 (1990) (upheld $11,000 cap on aggregate contributions candidate could accept from political committees), *cert. denied,* 498 U.S. 982, 111 S.Ct. 512, 112 L.Ed.2d 524 (1990). The $100 contribution limit imposed by the Minnesota statute is ten percent, or one-tenth, of the lowest limit upheld in the cases this Court has reviewed.

More than eighteen years ago, the Supreme Court upheld a $1000 limit on contributions to campaign committees and individuals. The *Buckley* Court noted that, in the preceding two-year election cycle, only 5.1% of all contributions to candidates for the United States Congress exceeded $1000. *Buckley,* 424 U.S. at 21, n. 23, 96 S.Ct. at 636, n. 23. The Court also reviewed the individual contributions exceeding of $1000 received by the various appellants, finding that several received no such contributions. *Id.* at 34, n. 40, 96 S.Ct. at 642, n. 40. In no instance did such contributions constitute more than .25 percent of the total number of contributions. *See id.* It appears that very few donors contributed more than $1000 to candidates and committees in 1976; those making donations exceeding $1000 were plainly

"large" contributors, implicating the Government's interest in combatting political corruption. *See Buckley*, 424 U.S. at 26, 96 S.Ct. at 638. Thus, the Court could readily find that a $1000 limit narrowly focused on truly large contributions, which posed the greatest threat of corruption.

Here, the record shows that in the last election cycle at least one-fourth and possibly as much as one-third of the total monetary value of MCCLCSPC's contributions came from contributions exceeding $100. (*See* First & Second Schwietz Affid.) It appears that the $100 limit would significantly reduce the ability of MCCLCSPC—and thereby the collective ability of its individual contributors—to provide financial support to candidates. *Cf. Buckley*, 424 U.S. at 29, 96 S.Ct. at 640 ($1000 contribution limit allowed individuals to financially support candidates and committees "to a limited but nonetheless substantial extent").

More significantly, inflation has substantially eroded the relative value of the dollar since the 1976 *Buckley* decision. As measured by the Consumer Price Index, one dollar in 1992 was equivalent to approximately $.406 in 1976. This means that, for purposes of comparison, today's $100 contribution limit translates to approximately $40.60 at the time of *Buckley*.[11] Thus, in real terms, the contribution limit prescribed by Minn.Stat. § 10A.27 subd. 12 is approximately 4 percent or ½₅ of the limit approved in *Buckley*. In the Court's view, the difference in these two limits is so substantial that the

Minnesota statute constitutes a regulatory "difference in kind."

A $100 limit on contributions regulates too broadly by limiting the rights of association of relatively small contributors along with those of large contributors. The Supreme Court has held that the Constitution allows limitation of contributions only to the extent such limits are necessary to reduce actual and apparent corruption engendered by *large* individual financial contributions. *Buckley*, 424 U.S. 1, 25–29, 96 S.Ct. 612, 637–40. The Court concludes that the $100 limit is not narrowly drawn to serve those ends. The limit is so low that it unnecessarily limits the rights of citizens to engage in legitimate expressive political activity and abridges their rights of association guaranteed by the First Amendment. *See id.* Therefore, the Defendants and the State of Minnesota may not enforce Minn.Stat. § 10A.27 subd. 12. Because the Court has held Subdivision 12 invalid under the First Amendment, it need not assess the Plaintiffs' equal protection challenge to the same statute.[12]

Having held Subdivision 12 unconstitutional, the Court must determine whether that holding requires it to invalidate the entire statute. The Minnesota statute governing this question provides:

Unless there is a provision in the law that the provisions shall not be severable, the provisions of all laws shall be severable. If any provision of a law is found to be unconstitutional and void, the remaining provisions of the law shall remain valid, unless

---

11. The most recent year for which annual Consumer Price Index (CPI) data is available is 1992. The Court made its calculations using the "All items" CPI for 1976 and 1992. *See* 1993 Statistical Abstract of the United States, table no. 756. The 1976 CPI was 56.9 and the same datum for 1992 was 140.3. Thus, the appropriate "deflator" to convert 1992 dollars to 1976 dollars is 56.9/140.3 %= .406. Multiplying .406 times $100 yields the value of the present $100 contribution limit in 1976 dollars, $40.60. Because there has been additional inflation between December 31, 1992 and the present, the actual value of 100 mid–1994 dollars in 1976 terms would be lower than $40.60.

12. Assuming, *arguendo*, that political committees and candidates are similarly situated for equal protection purposes, the Court would apply a

"strict scrutiny" test to determine whether the differential contribution limits applied to political committees and individual candidates are allowed by the Equal Protection Clause of the Fourteenth Amendment. Because the Court previously determined the statute implicates Plaintiffs' fundamental right of association under the First Amendment, heightened scrutiny of the differential classification would be appropriate. *See New York State Club Ass'n v. City of New York*, 487 U.S. 1, 13–16, 108 S.Ct. 2225, 2234–36, 101 L.Ed.2d 1 (1988); *Lyng v. Automobile Workers*, 485 U.S. 360, 365–66, 108 S.Ct. 1184, 1189–90, 99 L.Ed.2d 380 (1988). While the Defendants have adduced ample evidence to show the statutory classification has a rational basis, it is doubtful that the law could withstand strict scrutiny.

the court finds the valid provisions of the law are so essentially and inseparably connected with, and so dependent upon, the void provisions that the court cannot presume the legislature would have enacted the remaining valid provisions without the void one; or unless the court finds the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

Minn.Stat. § 645.20. The foregoing statute "creates a presumption of severability which is rebutted only if the court concludes the Minnesota legislature would not have enacted the valid portions without the void ones" *Bang v. Chase,* 442 F.Supp. 758, 770 (1977). As a general rule, an unconstitutional statutory amendment is ineffective and leaves the statute as it was prior to the amendment *Bongard v. Bongard,* 342 N.W.2d 156, 159 (Minn.App.1983).

The other provisions of Chapter 10A (the "Ethics in Government Act") do not depend on Section 10A.27 subd. 12. All are separate, independent and enforceable without reference to Subdivision 12. In fact, most of the provisions of Chapter 10A were enacted prior to the 1993 amendments that created Subdivision 12. The Court finds no evidence to suggest that the void provision is an indispensable part of the statutory scheme or that the Legislature would not have enacted Chapter 10A or the remaining 1993 amendments without the invalid contribution limit. Therefore, the Court will invalidate only the single provision it finds unconstitutional, Minn.Stat. § 10A.27, subd. 12.

## IV. Minn.Stat. § 211B's Corporate Contribution Prohibition

Plaintiff MCCL, Inc. (MCCL) challenges Minn.Stat. § 211B's limits on political contributions by corporations. MCCL is a nonprofit corporation which engages in limited business activities and accepts contributions from for-profit business corporations. MCCL has made expenditures in the past for the purpose of advocacy on behalf of candidates for public office and desires to continue to do so. It has not made independent expenditures to promote or defeat candidates in the past but desires to make such expenditures in the future. The challenged statute, which would prohibit MCCL as presently organized from making both direct contributions and independent expenditures, provides in relevant part:

**211B.15. Corporate political contributions**

**Subdivision 1. Definitions.** For purposes of this section, "corporation" means:

(1) a corporation organized for profit that does business in this state; [or]

(2) a nonprofit corporation that carries out activities in this state

\*     \*     \*     \*     \*     \*

**Subd. 2. Prohibited contributions.** A corporation may not make a contribution or offer or agree to make a contribution, directly or indirectly, of any money, property, free service of its officers, employees, or members, or thing of monetary value to a major political party, organization, committee, or individual to promote or defeat the candidacy of an individual for nomination, election, or appointment to a political office. For the purpose of this subdivision, "contribution" includes an expenditure to promote or defeat the election or nomination of a candidate to a political office that is made with the authorization or expressed or implied consent of, or in cooperation or in concert with, or at the request or suggestion of, a candidate or committee established to support or oppose a candidate.

**Subd. 3. Independent expenditures.** A corporation may not make an independent expenditure or offer or agree to make an independent expenditure to promote or defeat the candidacy of an individual for nomination, election, or appointment to a political office. For the purpose of this subdivision, "independent expenditure" means an expenditure that is not made with the authorization or expressed or implied consent of, or in cooperation or in concert with, or at the request or suggestion of, a candidate or committee established to support or oppose a candidate.

\*     \*     \*     \*     \*     \*

**Subd. 15. Nonprofit corporation exemption.** The prohibitions in this section do not apply to a nonprofit corporation that:

(1) cannot engage in business activities;

(2) has no shareholders or other persons affiliated so as to have a claim on its assets or earnings; and

(3) was not established by a business corporation or a labor union and has a policy not to accept significant contributions from those entities.

Minn.Stat. § 211B.15 (Supp.1994).

### A. Scope of Regulation

■ MCCL initially contends that the language of Subdivision 3 is too broad to fit within the allowable scope of government regulation of independent expenditures delineated in *Buckley* and its progeny. The Court understands the Plaintiff to assert a vagueness challenge. Ironically, the Plaintiff's argument here is notable more for its brevity than for its clarity. However, the standards for analyzing a "void-for-vagueness" challenge set forth *supra* at II.B apply equally to MCCL's challenge to Section 211B.15. In *Buckley*, the Supreme Court found statutory limits on independent expenditures "relative to a clearly identified candidate" unconstitutionally vague, but upheld the limit after construing the quoted language of the statute to apply to expenditures "for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." *Buckley*, 424 U.S. at 44, 96 S.Ct. at 646–47. In the present case, the statute prohibits corporations from making independent expenditures "to promote or defeat the candidacy of an individual for nomination, election, or appointment to a political office." Minn. Stat. § 211B.15 subd. 3. Unlike the language in *Buckley*, the foregoing requires no limiting construction. A person of ordinary intelligence could readily understand that what is prohibited is any expenditure for communication clearly directed at a specific candidate with the intent of encouraging or discouraging the candidate's election or appointment. In the words of the *Buckley* Court, Subdivision 3 prohibits "communica-tions that in express terms advocate the election or defeat" of a candidate for elective or appointed office. *See id.*

Contrary to MCCL's contention, the fact that the limits of Chapter 211B extend to expenditures to promote or defeat the candidacy of an individual for *appointment* to public office does not violate its First Amendment rights. Although the issue was apparently not presented in *Buckley*, this Court can discern no difference between the importance of the government interest in avoiding corruption in the electoral process and the same interest in the appointment process. For example, corporate expenditures to encourage the appointment of a specific individual to an executive branch position present a similar risk of *quid pro quo* unfair favorable treatment of the supporting corporation by the appointed official. Obviously, such a transaction is equally corrupting and carries equal potential for erosion of citizens' confidence in their government regardless of whether the complicit official is elected or appointed.

MCCL relies on *Bellotti* to support its contention that the State may not regulate corporate expenditures favoring or opposing a candidate for appointment. *Bellotti* stands for the proposition that a state may not prohibit a corporation from spending money to influence public debate or the outcome of a referendum *on an issue*. *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707. *Bellotti* found "[r]eferenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." *Bellotti*, 435 U.S. at 790, 98 S.Ct. at 1423 (internal citations omitted). *Bellotti* teaches that expenditures on behalf of a candidate, who may be susceptible to improper influence, differ in essential respects from expenditures directed at an inanimate issue of public concern. Those differences do not depend on whether a candidate seeks elected or appointed public office.

### B. Non–Profit Corporation Exception

■ MCCL's principal objection to the corporate political contributions statute is

that the First Amendment precludes the State from proscribing independent expenditures by non-profit corporations like MCCL. Due to the "unique state-conferred corporate structure that facilitates the amassing of large corporate treasuries ... [c]orporate wealth can unfairly influence elections when it is deployed in the form of independent expenditures." *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 660, 110 S.Ct. 1391, 1398, 108 L.Ed.2d 652 (1990). The unique legal and economic attributes of corporations thus creates the potential for corruption or the appearance of corruption through corporate political expenditures. *Id.* 494 U.S. at 658–62, 110 S.Ct. at 1397–98. Avoidance of such corruption or its appearance is a compelling government interest, justifying some regulation of corporations' political expenditures. *Id.; FEC v. Mass. Citizens for Life,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (hereinafter *MCFL* ); *cf. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407 (1978) (state may not restrict corporate spending to influence public debate or referenda on *issues* because no risk of corruption).[13]

It is well established that states may impose the type of restrictions contained in Minn.Stat. § 211B.15 on *for-profit* corporations. *See MCFL,* 479 U.S. 238, 107 S.Ct. 616; *FEC v. Nat'l Conserv. Pol. Action Comm.,* 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985); *FEC v. Nat'l Right to Work Comm.,* 459 U.S. 197, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982). However, in *MCFL,* the Supreme Court carved a narrow exception for non-profit corporations that meet certain criteria. Organizations that meet those three criteria must be exempted from independent expenditure regulation because they pose no danger of corruption of the political process and thus the government lacks the compelling interest necessary to justify regulation. *MCFL,* 479 U.S. at 263–65, 107 S.Ct. at 630–32. The Court specifically found that the defendant non-profit corporation (MCFL) had three attributes that were *essential* to the Court's holding that the government could not regulate the defendant's political expenditures:

*First,* it was formed for the express purpose of promoting political ideas, and cannot engage in business activities.... *Second,* it has no shareholders or other persons affiliated so as to have a claim on its assets or earnings.... *Third,* MCFL was not established by a business corporation or a labor union, and it is its policy not to accept contributions from such entities. This prevents such corporations from serving as conduits for the type of direct spending that creates a threat to the political marketplace.

*Id.* 479 U.S. at 264, 107 S.Ct. at 631. Subdivision 15 codifies the requirements for non-profit corporations set forth in *MCFL,* providing that the prohibitions set forth in Chapter 211B do not apply to nonprofit corporations that (1) cannot engage in business activities; (2) have no shareholders; and (3) were not established by a business corporation or labor union and have a policy against accepting contributions from those entities. *See* Minn.Stat. § 211B.15 subd. 15.

MCCL does not have shareholders, but it cannot satisfy the remaining two requirements. Because the *MCFL* Court indicated all three requirements were essential to the non-profit exception, failure to meet any single criterion would be independently sufficient to deny MCCL exemption from the regulation. The corporation admits that it engages in business activities, including rental of its membership list and advertisement sales. (*See* Second Schwietz Affid. ¶ 7). It essentially argues for a *de minimis* exception, contending that its business activities are "incidental to [MCCL]'s primary purpose" and generate relatively little income and thus pose little risk of actual or apparent corruption of the political process. However, neither *MCFL* nor Subdivision 15 provides an exception for "incidental" business activities. *See MCFL,* 479 U.S. at 263, 107 S.Ct. at 630–31 (reason that corporation exempted was not that it posed *lesser* threat of corruption, but that it posed no threat at all).

**13.** Minn.Stat. § 211B.15 subd. 4 makes clear that corporations may make contributions to promote or defeat a ballot question or to comment on issues of public concern. Thus, the statute complies with the rule announced in *Bellotti.*

MCCL similarly contends that it satisfies the third *MCFL* requirement because the contributions it receives from business corporations are relatively small and are insignificant. The portion of MCCL's receipts derived from corporate contributions or whether corporate contributions are "significant," is irrelevant. MCCL admits it accepts corporate contributions and it has neither alleged nor proved through that it has a policy against accepting such contributions. Absent a clear, enforced policy against accepting contributions, the risk exists that a non-profit corporation could accept large contributions from for-profit business corporations and become an instrument for precisely the type of unfair influence on the political process the limits on for-profit independent expenditures properly seek to eradicate. *See, e.g., Austin,* 494 U.S. at 660–62, 110 S.Ct. at 1398; *MCFL,* 479 U.S. at 262–64, 107 S.Ct. at 630–31. Because MCCL has no policy against accepting contributions from business corporations, it cannot satisfy the third requirement of the *MCFL* exception. *See id,* 479 U.S. at 264, 107 S.Ct. at 631; *FEC v. NRA Pol. Victory Fund,* 778 F.Supp. 62, 64 (D.D.C.1991), *rev'd on other ground,* 6 F.3d 821 (D.C.Cir.1993).

Finally, MCCL asserts that Minn. Stat. § 211B.15 subd. 2 violates its First Amendment rights and those of its members "by completely prohibiting MCCL from encouraging its members to volunteer their services to candidates." This contention misconstrues the terms of the statute. The language of the challenged subsection prohibits corporations from contributing "the free service[s] of its … members," Minn. Stat. § 211B.15 subd. 2, to a candidate for office or political organization, but says nothing about encouraging members to participate in the political process. The phrase "contribution of free service of its members" implies some ability of the corporation to compel or control the attendance of or provision of other services by its members, most plausibly because the corporation pays monetary compensation to those members. There is no evidence that MCCL exercises such control over its members. Further, nothing in the statute limits internal communications between a corporation and its members.

MCCL remains free to "encourage" its members to voluntarily participate in political activities, as long as the members are acting on their personal time and not as officers or employees of the corporation when they participate in those activities.

MCCL further contends that Subdivision 2 unconstitutionally restricts the right of individuals to participate in the political process. By its terms, the statute applies only to corporations, not to the conduct of individuals. *See* Minn.Stat. § 211B.15 subd. 2. "[S]ervices provided without compensation by an individual volunteering personal time on behalf of a candidate, ballot question, political committee or political fund" are expressly excluded from the distinct statutes governing individual political contributions. *See* Minn.Stat. §§ 10A.01, subd. 7 & 10A.27, subd. 1. Subdivision 2 does not apply to individuals and does not limit their First Amendment rights.

The corporate contributions statute, Minn. Stat. § 211B.15, is not unconstitutionally vague or overinclusive. For purposes of this First Amendment analysis, any differentiation between candidates for appointed and elected public office is a distinction without a difference. MCCL's failure to satisfy two of the three *MCFL* requirements disqualifies it from the narrow non-profit corporation exemption from government regulation. The statute does not otherwise infringe Plaintiffs' constitutional rights. The State's regulation of corporate political expenditures embodied in Minn.Stat. § 211B.15 is thus constitutional as applied to MCCL.

## CONCLUSION

The challenged independent expenditure provisions of Minn.Stat. § 10A are constitutional and the State may enforce those provisions. The $100 contribution limit set forth in Minn.Stat. § 10A.27 subd. 12 is not narrowly tailored to satisfy the government's compelling interest in avoiding the potential for corruption of the political process and the appearance of such corruption. That provision of the statute violates the First Amendment and therefore the State may not enforce Minn.Stat. § 10A.27 subd. 12. The challenged portions of the State's regulation

of corporate political contributions and expenditures, set forth in Minn.Stat. § 211B.15, are constitutional, and the State may enforce that statute.

Accordingly, **IT IS HEREBY ORDERED THAT:**

1. The Plaintiffs' motions for summary judgment are GRANTED only to the extent they seek a declaration that Minn.Stat. § 10A.27 subd. 12 is unconstitutional and to enjoin Defendants from enforcing that provision;

2. The Clerk of Court shall enter partial judgment in favor of the Plaintiffs in Civil File Nos. 3–93–857 and 3–93–876, declaring Minn.Stat. § 10A.27 subd. 12 unconstitutional and permanently enjoining Defendants from enforcing Minn.Stat. § 10A.27 subd. 12;

3. The Plaintiffs' motions for summary judgment are DENIED in all other respects;

4. The Clerk of Court shall enter judgment in favor of the Defendants on all Counts of Plaintiffs' Complaints in Civil File Nos. 3–93–857 and 3–93–876, with the exception of the partial judgment in favor of Plaintiffs ordered in Item 2, *supra;* and

5. These suits are DISMISSED.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**